**ALASKA CENTER FOR THE ENVIRON-MENT, Northern Alaska Environmental Center, Southeast Alaska Conservation Council, and Trustees for Alaska, Plaintiffs,**

v.

**William K. REILLY, Administrator, the U.S. Environmental Protection Agency, EPA Region X, and Dana A. Rasmussen, in her capacity as Regional Administrator, Defendants.**

**No. C90–595R.**

United States District Court, W.D. Washington, at Seattle.

April 15, 1991.

---

Brian Faller, Seattle Law Enforcement, Utilities and Environmental Protection, Seattle, Wash., Michael Wenig, Anchorage, Alaska, for plaintiffs.

Susan L. Barnes, U.S. Attys. Office, Seattle, Wash., Christopher Scott Vaden, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on plaintiffs' motion for partial summary judgment. Having reviewed the motion, together with all documents filed in support and in opposition, having heard oral argument and being fully advised, the court finds and rules as follows:

Plaintiffs Alaska Center for the Environment, et al. (collectively "ACE"),[1] move for partial summary judgment against defendants U.S. Environmental Protection Agency, et al. (collectively "EPA"), on the issue of liability under the Clean Water Act. If the motion is granted, plaintiffs indicate they will file a motion to compel the EPA to perform its duties under § 303(d) of the Act pursuant to a schedule developed by the court.

### I. FACTUAL BACKGROUND

Plaintiffs have filed this citizen suit to compel the EPA to perform what plaintiffs

---

1. Plaintiffs include Alaska Center for the Environment, Northern Alaska Environmental Center, Southeast Alaska Conservation Council, and Trustees for Alaska.

believe is a mandatory duty to implement certain water quality protection measures under the Clean Water Act ("CWA" or "the Act").

## A. Water Pollution Regulation

Congress passed the Federal Water Pollution Control Act (commonly referred to as the CWA) in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Sec. 101(a), 33 U.S.C. § 1251. In order to achieve that objective, Congress declared as a "national goal" that "the discharge of pollutants into the navigable waters be eliminated by 1985." Id., § 101(a)(1).

EPA's regulatory program for water protection focuses on two potential sources of pollution: point sources and nonpoint sources. Point source pollution was addressed in the 1972 amendments to the Act, where Congress prohibited the discharge of any pollutant from any point source into certain waters unless that discharge complies with the Act's specific requirements. Secs. 301(a) and 502(12), 33 U.S.C. §§ 1311(a) and 1362(12). Under this approach, compliance is focused on technology-based controls for limiting the discharge of pollutants through the National Pollution Discharge Elimination System ("NPDES") permit process.

When these requirements are found insufficient to clean up certain rivers, streams or smaller water segments, the Act requires use of a water-quality based approach. States are required to identify such waters and designate them as "water quality limited." The states are then to establish a priority ranking for these waters, and in accordance with that ranking, to establish more stringent pollution limits called "total maximum daily loads" or "TMDLs." 33 U.S.C. §§ 1313(d)(1)(A), (C). TMDLs are the greatest amount of a pollutant the water body can receive daily with-

out violating a state's water quality standard.

The TMDL calculations help ensure that the cumulative impacts of multiple point source discharges are accounted for, and are evaluated in conjunction with pollution from other nonpoint sources. States are then required to take whatever additional cleanup actions are necessary, which can include further controls on both point and nonpoint pollution sources. As a recent GAO report concluded, the TMDLs process:

> provides a comprehensive approach to identifying and resolving water pollution problems regardless of the sources of pollution. If implemented, the TMDL process can provide EPA and the states with a complete listing of key water pollutants, the source of the pollutants, information on the amount of pollutants that need to be reduced, options between point and/or nonpoint approaches, costs to clean up, and situations where it may not be feasible to meet water quality standards.[2]

It is the TMDL regulatory process upon which this lawsuit focuses. The CWA sets out a very specific timetable and description of mandatory duties on the part of states and the EPA for the TMDL process. The court is being asked to clarify the scope of the EPA's duties under this section of the Act.

## B. Duties of States and the EPA

Under § 303(d), states are required to submit lists of water quality limited segments and TMDLs to the EPA at certain times; the first such submission was due by June 26, 1979.[3] Once such a submission is made, certain mandatory duties by EPA are triggered. Within 30 days, the EPA Administrator must review the state's submissions of the identified waters and the load allocations established under § 303(d)(1). Once approved by EPA, the identified waters and TMDLs are incorpo-

---

2. US Government Accounting Office, "Water Pollution—More EPA Action Needed to Improve the Quality of Heavily Polluted Waters," January 1989 (GAO/RCED–89–38) at 34–5, (see Plaintiffs' Ex. C.) (hereinafter referred to as "GAO report").

3. Since the EPA published its identification of suitable pollutants in December, 1978, states' first submissions were due 180 days later, or June, 1979. 33 U.S.C. § 1313(d)(2).

rated by the state into its continuing planning process established under § 303(e)(3).

If EPA disapproves the identification and/or TMDL, the agency has 30 days after disapproval to make its own identification of waters and establish TMDLs necessary to implement the applicable water quality standards. § 303(d)(2). The Act is silent as to the nature of EPA's obligations if a state, such as Alaska here, fails to make any initial submission at all.

### C. History of the TMDLs Process in Alaska

As indicated, the first identification of "water quality limited" waters by the State of Alaska was required in 1979. Over ten years later, it is undisputed that the State has not submitted a single TMDL to the EPA. Moreover, the State and the EPA have failed to complete even the first stage of the TMDL process. Alaska's 1988 305(b) Report[4] categorized several hundred distinct waterbodies as either "impaired" or "threatened" by water pollution. *See* Plaintiffs' Ex. G. However, only *one* segment from all these waterbodies has been identified as "water quality limited." There is no evidence that the EPA ever approved or disapproved that submission within the 30 day deadline.

The EPA directly commented on the State's failure again to include "water quality limited" segments in its 1990 305(b) report. *See* Plaintiffs' Ex. E, letter from Kriezenbeck. The EPA gave the State until June 30, 1990, to provide such a list.

Shortly after this suit was filed in April 1990, the State submitted to the EPA a revised list of 48 "water quality limited" segments. To date, the EPA does not appear to have approved or disapproved this list. Plaintiffs contend there is little hope that the State will begin to take the next step and establish TMDLs in a timely fashion. The State's 1990 305(b) Report notes

that TMDLs have "not been attempted" and makes no promise to "attempt" them.

In comparison to Alaska's lack of progress in developing TMDLs, other areas of the country have a mixed record of success. In 1989, EPA Region IV approved 163 TMDLs, Region V approved 74, Region I approved 50, Region VIII approved 16, Region X approved 11. Regions II, III, and VII, however, approved no TMDLs. Pl.Ex. K.[5]

Plaintiffs now ask the court to direct the EPA to establish TMDLs in lieu of any meaningful action on the part of the State. Defendants oppose the motion, arguing that the EPA does not have a mandatory duty to establish TMDLs in the absence of a submission by the states. Defendants argue that in the absence of a nondiscretionary duty, plaintiffs are unable to pursue a citizen suit under § 505(a) of the Act, and therefore this court lacks jurisdiction to hear the case.

## II. DISCUSSION

### A. Summary Judgment Standard

◼ A grant of summary judgment is appropriate if it appears, after viewing the evidence in the light most favorable to the opposing party, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630–31 (9th Cir.1987); *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985). Here, the parties agree that there are no material facts in dispute; rather, the questions before the court are legal in nature. Thus, the matter is ripe for summary judgment.

### B. Mandatory Duties of the EPA

Section 505(a) of the CWA authorizes citizens to bring suit in federal court against the EPA for failing to perform an

---

**4.** Under section 305(b) of the Act, states are required to provide the EPA with a biennial report on the status of the state's water quality management. It is commonly referred to as a "305(b) report."

**5.** Within Region X, Washington and Idaho are also delinquent in not developing TMDLs. Oregon is in the process of establishing 40 TMDLs as part of a consent decree resulting from a lawsuit filed in December 1986.

"act or duty" under the CWA which is not discretionary. 33 U.S.C. § 1365(a). Plaintiffs invoke this section in their attempt to protect the waters of Alaska from further degradation in light of State regulatory inaction.

In determining whether the EPA has a mandatory duty under sec. 303(d) to establish TMDLs at this time, the court looks to traditional principles of statutory construction. "Proper statutory construction requires more than linguistic examination and review of the rules of statutory construction. The interpretation should be reasonable, and where the result of one interpretation is unreasonable, while the result of another interpretation is logical, the latter should prevail." *Sierra Club v. Train*, 557 F.2d 485, 490 (5th Cir.1977); *Rosado v. Wyman*, 397 U.S. 397, 414–5, 90 S.Ct. 1207, 1218–19, 25 L.Ed.2d 442 (1970). "In interpreting statutes, a court's function is to construe the language so as to give effect to the intent of Congress." *Train*, 557 F.2d at 489.

The mandatory TMDLs process requires that states identify those waters that are below certain quality limits; establish a priority ranking for those waters; and establish TMDLs in accordance with the priority ranking. 33 U.S.C. § 1313(d)(1).

The exact statutory language at issue is as follows:

(2) Each State **shall** submit to the Administrator from time to time, with the first such submission not later than 180 days after the date of publication of the first identification of pollutants ... for his approval, the waters identified and the loads established ... **The Administrator shall either approve or disapprove such identification and load not later than 30 days after the date of submission.** If the Administrator approves such identification and load, such State shall incorporate them into its current plan ... **If the Administrator disapproves such identification and load, he shall not later than 30 days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines**

**necessary to implement the water quality standards applicable to such waters and ... shall incorporate them into its current plan**.... (emphasis added).

*Id.*

◼ Plaintiffs' suit alleges that the State of Alaska's failure to submit proposed TMDLs over a decade amounts to a "constructive submission" of no TMDLs, thereby triggering a mandatory duty on EPA's part to promulgate those TMDLs. To this end, plaintiffs rely on the Seventh Circuit decision in *Scott v. City of Hammond, Ind.*, 741 F.2d 992 (7th Cir.1984). In this case directly on point, the court held that the EPA *did* have a duty to develop TMDLs when the appropriate states failed to comply with the statute.

The *Scott* case involved a citizen suit against the EPA Administrator for failure to prescribe TMDLs for pollutants discharged into Lake Michigan after Illinois and Indiana failed to do so. Given the lengthy delay from the State's submissions deadline in 1979, the Seventh Circuit had little difficulty in reversing the district court and concluding that the EPA *did* have an affirmative duty to treat the States' inaction as a "constructive" submission, warranting agency response. The court held,

We believe that, if a state fails over a long period of time to submit proposed TMDL's, this prolonged failure may amount to the "constructive submission" by that state of no TMDL's. Our view of the case is quite simple, and tracks the statutory scheme set up by Congress ... The allegation of the complaint that no TMDL's are in place, coupled with the EPA's admission that the states have not made their submissions, raises the possibility that the states have determined that TMDL's for Lake Michigan are unnecessary ... (T)hen the EPA would be under a duty to either approve or disapprove the "submission."

741 F.2d at 996–7.

The *Scott* court went on to discount the EPA's argument that Congress did not intend to establish a statutory duty, saying,

None of the EPA's arguments against the existence of this statutory duty are

compelling. The EPA claims that Congress did not intend that the EPA establish TMDL's if the states chose not to act. We think it unlikely that an important aspect of the federal scheme of water pollution control could be frustrated by the refusal of states to act. This is especially true in light of the short time limits both on a state's action, and on the EPA's required reaction to the state's submission....

*Id.* The Seventh Circuit also noted that, based on its consideration of the importance of water pollution control, the Supreme Court has rejected a similar argument to the one EPA makes here respecting the states' role in pollution control. *E.I. Du Pont De Nemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). In construing the CWA to grant the EPA broad power, the Supreme Court wrote, "We do not believe that Congress would have failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals." *Id.*

■ Congress' repeated use of the term "shall" in sec. 303(d) clearly places a mandatory duty upon the EPA to take affirmative action after disapproving a state's unacceptable submission. Read in light of common sense and the fact that Congress set out such short time lines in this section, it is strongly arguable that Congress intended that EPA's affirmative duties be triggered upon a state's failure to submit a list, or any TMDL at all. As the Seventh Circuit reasoned in *Scott,*

> We cannot allow the states' refusal to act to defeat the intent of Congress that TMDLs be established promptly—in accordance with the timetable provided in the statute. In addition, to construe the relevant statute (any other way) would render it wholly ineffective. There is, of course, a strong presumption against such a construction.

741 F.2d at 998.

The Ninth Circuit has not had the opportunity to decide this exact issue. However, in a 1985 case, the Ninth Circuit recited, without questioning, the Seventh Circuit's holding in *Scott,* but held that the EPA's mandatory duties had not been triggered since there had been no claim that the waterbody at issue was water quality limited. *City of Las Vegas, Nev. v. Clark County, Nev.,* 755 F.2d 697, 703-4 (9th Cir.1985).

In *Environmental Defense Fund v. Costle,* 657 F.2d 275 (D.C.Cir.1981), plaintiff challenged the EPA's failure to develop TMDLs for salinity in the Colorado River, following inadequate submissions from the states. The court found that the EPA's duties had not yet been triggered since the State's deadline for submitting a TMDL had not yet passed. *Id.* at 295. However, the court was clear in its insistence that the EPA act promptly in administering the review and establishment of TMDLs, saying "we admonish EPA to approve or disapprove such identification, prioritization, and load limits within the requisite statutory framework and time limits ... We urge EPA to carefully heed the statutory deadlines in the future." *Id.*[6] The court's emphasis on timely federal review of state action supports an interpretation of the Act that mandates federal intervention when states fail to perform their statutory duties.

The EPA's opposition to this motion is rooted in its conclusion that the *Scott* court went too far. While agreeing with the Seventh Circuit's conclusion that prolonged state inaction may be characterized as a determination that no TMDLs are necessary, the EPA faults the *Scott* court for going beyond the clear language of the statute and creating an enforcement remedy that was not intended by Congress. The EPA appears to argue that, before its mandatory duty to establish TMDLs is triggered, the agency has discretion (1) to determine *whether* a state's failure to submit a TMDL amounts to such a constructive

---

**6.** In *Costle,* the court's strong language regarding attention to deadlines arose in a suit filed over a delay in TMDL development of months. Surely the same admonishment is appropriate where the delay has stretched to over a decade.

submission, and (2) to decide *when* to make that determination.

The EPA maintains that there is a clear distinction between a court determination that EPA has *discretionary* authority to act in the absence of state submissions, and an "overreaching" decision that such authority is a *mandatory duty*. The EPA does not believe that its discretionary powers should be subject to citizen suit enforcement under section 505, and that it should retain the ability to decide not to enforce certain laws. Quoting the Supreme Court in *Heckler v. Chaney*, the EPA argues:

> An agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all.

470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

The EPA reassures the court that the purpose of the Act is not frustrated by the agency's narrower interpretation of its mandatory duties, because EPA retains discretionary authority to take action when states fail to. This reassurance is not particularly comforting in light of the fact that EPA Region X has failed to take action on this matter for over ten years.

■ EPA implies that, because of the states' supposed "primacy" in the field of pollution control, if states fail to perform their "primary" roles, Congress did not intend to shift the responsibilities to the EPA. On the contrary, the court finds it improbable, and unsupported by case law,

that if the states default, Congress intended that their roles would remain unfulfilled. The court agrees with the Seventh Circuit that it is unlikely that Congress intended an important aspect of the federal water pollution control scheme to be frustrated by the failure of a state to act. 741 F.2d at 997.[7]

In support of their opposition, defendants point to the short deadlines written into this section of the Act. The EPA reasons that 30 days is too short a time for Congress to have contemplated the EPA being able to complete the entire TMDL process from scratch, in the absence of state data from which to work. There would be insufficient time for the appropriate comment and review typically available in administrative rulemaking. EPA's reasoning is based on the assumption that, when a state submits a defective TMDL, it nevertheless has performed all the preliminary work necessary to establish a correct TMDL.

■ While it may be true that the EPA could be faced with a dearth of data collection on the State's part, this fact does not warrant a conclusion that the agency is therefore devoid of responsibility for initiating the fact-finding process. Absence of data is not the determinative factor in this analysis. For example, a state could submit a TMDL based on a complete lack of credible data, or affirmatively refuse to establish any TMDL at all. The EPA concedes that in this situation, it would clearly have the mandatory duty to establish a TMDL, despite its not having any of the necessary underlying data provided to them by the State.

Finally, the EPA believes that since it is charged with administration of the CWA, its judgment as to the use of certain enforcement provisions is entitled to defer-

---

**7.** The court also finds the EPA's analogy to "prosecutorial discretion" inapplicable here. As the court found in *NRDC v. N.Y. Dept. of Environmental Conservation*, 700 F.Supp. 173 (S.D. N.Y.1988), statutory construction based on prosecutorial discretion is inappropriate to the disputed CWA section here, because neither prosecution nor sanctions is at issue. *Id.* at 179. Interpreting § 303(d) to require the Administrator to promulgate TMDLs in the absence of state action "does no more than require the Administrator to act to ensure compliance with dates specified in the statute." *Id.*

ence.[8] *U.S. v. Homestake Mining Co.*, 595 F.2d 421, 429 (8th Cir.1979). If Congress has not addressed the precise question at issue, the Court may not simply impose its own construction on the statute; it must determine whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

The court finds here that Congress *has* addressed the question at issue. Section 303(d) expressly requires the EPA to step into the states' shoes if their TMDL submissions or lists of water quality limited segments are inadequate. It is consistent to conclude that the "inadequacy" of a submission includes deliberate, silent inaction.

There is clear legislative history and judicial support for strong enforcement of the CWA. Rather than construing EPA's mandatory duties in an overly narrow manner, traditional statutory interpretation directs that the court give life to the spirit of the Act. The EPA's interpretation of § 303(d) puts the TMDL process in "administrative purgatory", to use another court's phrase [9], pending the agency's eventual review of the state's inaction. The court finds this unreasonable, illogical, and inconsistent with the CWA's purpose. "State inaction amounting to a refusal to act should not stand in the way of successfully achieving the goals of federal anti-pollution policy." *Scott*, 741 F.2d at 998.

## CONCLUSION

NOW, THEREFORE, plaintiffs' motion for partial summary judgment is GRANTED. The court finds that § 303(d) of the CWA does set out a nondiscretionary duty on the part of the EPA for promulgation of TMDLs in the face of state inaction.

The court need not make a broad, generic determination of the point in time at which a state's inaction may be deemed a "constructive submission." However, there could hardly be a more compelling case for finding a "constructive submission" than under the facts of this specific case. The court therefore finds that the State of Alaska has effectively created a "constructive submission" of no TMDLs over the past eleven years. The EPA is required, therefore, to initiate its own process of promulgating TMDLs, including any and all necessary steps needed to effectively identify the appropriate waterbodies at issue. The details of this process will be worked out with the court at a future date.

8. In light of the agency's insistence on deference to its interpretation of the CWA, it is interesting to note that EPA Region X's Chief of the Office of Water Planning, Thomas Wilson, has included a statement in an October 1990 report that strongly suggests EPA views itself as having a duty to respond to state inaction on TMDLs. The report says,

> ... by statute, EPA is given only 30 days to identify and establish any TMDL needed because of State inaction. This short deadline, along with the margin of safety requirement discussed below, almost guarantees that any EPA-developed TMDL would be more stringent than a State-developed one ...

EPA Nonpoint Source News–Notes, October 1990, at 20, Plaintiffs' Ex. A. In this statement,

Wilson extols the *benefits* of aggressive use of the TMDLs program. In addressing concern about what happens if the State or EPA does not have enough data to establish a scientifically precise TMDL, Wilson notes that the statute builds in a margin of safety requirement to be used to account for any lack of knowledge.

> In other words, Congress says ignorance is no excuse for inaction. Just add a margin of safety to compensate for the lack of knowledge and keep moving. No other program has such a strong statutory endorsement for action in the face of an incomplete database. *Id.*

9. See *Citizens for a Better Environment v. Costle*, 515 F.Supp. 264, 274 (N.D.Ill.1981).