**ALASKA CENTER FOR THE ENVIRON-MENT, Northern Alaska Environmental Center, Southeast Alaska Conservation Council, and Trustees for Alaska, Plaintiffs,**

v.

**William K. REILLY, Administrator, United States Environmental Protection Agency, Dana Rasmussen Regional Administrator, and EPA Region X, Defendants.**

No. C90–595R.

United States District Court, W.D. Washington at Seattle.

June 8, 1992.

Brian Faller, Seattle Law Dept., Utilities and Environmental Protection, Seattle, Wash., Michael Wenig, Anchorage, Alaska, for plaintiffs.

Susan L. Barnes, U.S. Attorney's Office, Seattle, Wash., Christopher Scott Vaden, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., for defendants.

ORDER GRANTING PLAINTIFFS' MO-
TION TO COMPEL DEFENDANTS
TO PERFORM THEIR MANDATORY
DUTIES UNDER SECTION 303(d) OF
THE CLEAN WATER ACT

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on plaintiffs' motion to compel defendants to perform their mandatory duties under Section 303(d) of the Clean Water Act. Having reviewed the motion, all documents filed in support and in opposition, all supplemental memoranda and declarations, and having twice heard oral argument, the court finds and rules as follows:

## I. BACKGROUND

Plaintiffs Alaska Center for the Environment, et al. (collectively "ACE"),[1] filed this citizen suit to require the United States Environmental Protection Agency ("EPA") to fulfill its statutory obligation to implement water quality protection measures in Alaska. Plaintiffs' previous motion for

1. Plaintiffs include Alaska Center for the Environment, Northern Alaska Environmental Center, Southeast Alaska Conservation Council, and Trustees for Alaska.

2. *Alaska Center for Env't v. Reilly.* 762 F.Supp. 1422 (W.D.Wash.1991) (Rothstein, C.J.).

3. States are required to designate waters as "water quality limited segments" when point source discharge permits are insufficient to maintain

partial summary judgment was granted by this court on April 15, 1991.[2]

### A. EPA's Duties under the Clean Water Act.

Congress passed the Federal Water Pollution Control Act (commonly known as the Clean Water Act, "CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). This court described the EPA's regulatory program for water protection under the Act in its Order of April 15, 1991. *See, Alaska Center for Env't v. Reilly*, 762 F.Supp. 1422, 1424–1425 (W.D.Wash.1991).

This court found that the CWA requires the EPA to identify "water quality limited segments" if a state's submissions are inadequate, or if a state has not taken action. *Alaska Center for Env't v. Reilly*, 762 F.Supp. at 1429.[3] This court further found that in the face of Alaska's inaction, § 303(d) of the CWA imposed a nondiscretionary duty on the EPA to promulgate pollution limits called "total maximum daily loads" (TMDLs) for waters designated as water quality limited segments. *Id.* at 1429.[4] This court's Order of April 15, 1991 required the EPA to initiate its own process of identifying water quality limited segments and establishing TMDLs in accordance with a priority ranking of those water bodies. *Id.* at 1429.

### B. EPA's Progress in Initiating the TMDLs Process.

In July of 1990, Alaska submitted to the EPA a list of 48 water quality limited segments. The EPA partially approved Alaska's list on September 10, 1991. *See,* "Partial Approval of Alaska's Identification of Water Quality–Limited Segments," Exhibit

the state's water quality standard. This requirement is part of the CWA program to control water pollution from non-point sources. 33 U.S.C. § 1313(d)(1)(A)–(C).

4. A "total maximum daily load" ("TMDL") is the maximum amount of a pollutant a water quality limited segment can receive daily without violating the state's water quality standard. 33 U.S.C. § 1313(d)(1)(A)–(C).

C, Defendants' Memorandum in Support of Motion for Partial Summary Judgment. As a condition to the partial approval, the EPA requested that more information about additional water bodies suspected of being polluted be included in Alaska's 305(b) report, due in April of 1992.[5]

On January 27, 1992, the EPA Region X Administrator, Dana A. Rasmussen, and the Commissioner of the Alaska Department of Environmental Conservation ("ADEC"), John A. Sandor, signed a Memorandum of Understanding ("MOU") regarding the implementation of a TMDLs program in Alaska. Supplemental Declaration of Richard G. Albright, at 2, ¶ 3. According to the EPA, the MOU formalizes the agreement reached between the EPA and the ADEC after "many months of negotiations," and identifies the responsibilities to be carried out by each agency over the next two years. *Id.* at 2, ¶¶ 4, 5.

The MOU was agreed upon after plaintiffs filed this motion to compel the EPA to perform its mandatory duties under the CWA. Through supplemental memoranda, plaintiffs have altered their demands to incorporate the progress made by the MOU. Nevertheless, plaintiffs contend that the MOU does not adequately fulfill the EPA's statutory obligation to implement the TMDLs program. Plaintiffs assert that the process outlined in the MOU falls short of providing the requisite assurance that TMDLs will be established for all waters designated as water quality limited segments. Plaintiffs further contend that the MOU will in fact contribute to further delay in fully implementing a TMDLs program in Alaska.

Plaintiffs therefore move to compel the EPA to: (1) approve or disapprove Alaska's revised April 1, 1992 list of water quality limited segments by July 1, 1992; (2) promulgate its own list of water quality limited segments within 30 days, if the EPA disapproves the list; (3) establish, or review and approve the State's establishment of, TMDLs for each of the represent-

ative waters identified in the MOU by a date certain; (4) propose, and submit to the court, a schedule for the establishment of TMDLs for all waters designated as water quality limited segments; and, (5) generate a plan for ambient water quality monitoring in Alaska, and a schedule for the implementation of such a plan. Plaintiffs further request that the court retain jurisdiction over this case for the next five years to ensure compliance with the court's order.

## II. DISCUSSION

The Supreme Court has held that the CWA citizen suit provision allows a district court to "order the relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982). The Court explained that the "exercise of equitable discretion, which must include the ability to deny as well as grant injunctive relief, can fully protect the range of public interests at issue ..." *Id.* at 320, 102 S.Ct. at 1807; *See also, Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (acknowledging the "important role of the public interest in the exercise of equitable discretion").

■ The Ninth Circuit has also noted that "an injunction is not necessarily made overbroad by extending the benefit or protection to persons other than the prevailing parties—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled."* *Bresgal v. Brock,* 843 F.2d 1163, 1170–1171 (9th Cir.1987) (emphasis in the original). A district court has the discretion to fashion an appropriate remedy when the EPA fails to perform a mandatory duty. *Sierra Club v. Ruckelshaus,* 602 F.Supp. 892, 898–899 (N.D.Cal.1984) (ordering the EPA to issue final standards for radionuclide emissions within 90 days, after EPA's failure to adhere to statutory deadlines under the Clean Air Act).

---

**5.** States' biennial water quality assessment reports are commonly known by section 305(b) of

the CWA, which requires their submission.

The EPA claims that plaintiffs have not shown that they are entitled to injunctive relief. The EPA contends as follows: (1) that the remedy plaintiffs seek lies outside the court's jurisdiction; (2) that the court is not authorized to review the content of administrative action, or to engage in ongoing review of agency action; (3) that plaintiffs have not exhausted their administrative remedies; (4) that judicial oversight of the TMDLs process as proposed by plaintiffs would violate the separation of powers doctrine; and, (5) that plaintiffs have not shown injury due to the EPA's failure to implement a TMDLs program in Alaska sufficient to support injunctive relief.

The court finds the EPA's arguments unpersuasive. In citizen suits against the EPA courts have not required the kind of proof which the EPA argues is necessary before ordering the Agency to perform its mandatory duties. *See, New York v. Gorsuch,* 554 F.Supp. 1060, 1066 (S.D.N.Y. 1983) (ordering the EPA to comply with its statutory duty to promulgate emissions standards in a suit brought under the Clean Air Act's citizen suit provision); *Sierra Club v. California,* 658 F.Supp. 165, 175 (N.D.Cal.1987) (ordering the EPA to promulgate regulations for nitrogen oxides under the Clean Air Act); *Sierra Club v. Gorsuch,* 551 F.Supp. 785, 789 (N.D.Cal. 1982) (ordering the EPA to propose emission standard within 180 days).

Moreover, the Supreme Court has found that environmental injury is uniquely deserving of injunctive relief: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).

In this court's Order of April 15, 1992, granting plaintiffs' motion for summary judgment, this court found that § 303(d) of the CWA imposed a nondiscretionary duty on the EPA to promulgate TMDLs in the face of state inaction. *Alaska Center for Env't v. Reilly,* 762 F.Supp. 1422, 1429 (W.D.Wash.1991). The court specifically noted that the "details of this process will be worked out *with the court* at a future date." *Id.* at 1429 (emphasis added). The parties have made limited settlement progress during the year that has passed since the court's Order, and the EPA has taken only tentative steps to implement the TMDLs process to date.

The EPA allowed over a decade to pass before taking even these first steps towards implementing the Alaskan TMDLs program. This delay has rendered TMDLs completely useless to date as a tool to control water pollution in Alaska. The failure of the EPA to perform its mandatory duties has frustrated congressional intent underlying the TMDL provisions of the CWA. ACE has no adequate remedy other than a court order requiring the EPA to perform these duties. The court finds that injunctive relief in this case is necessary. The court addresses the appropriate scope of relief below.

## A. Alaska's Listing of Water Quality Limited Segments.

Section 303(d)(2) of the CWA requires the EPA to either approve or disapprove a state's list and priority ranking of water quality limited segments within thirty days of its submission to the EPA. 33 U.S.C. § 1313(d)(2). This section further requires the EPA to establish its own list and priority ranking within thirty days of disapproving a state's list.

Alaska submitted a list of 48 water quality limited segments in July of 1990. The EPA partially approved Alaska's list on September 10, 1991, although this partial approval came almost fourteen months after its submission, rather than within the thirty days required under the CWA. 33 U.S.C. § 1313(d)(2). The EPA clearly has violated the CWA's statutory deadline.

Plaintiffs contend that by granting only partial approval of Alaska's list, the EPA sought to avoid triggering its statutory duty to create its own list of water quality

limited segments within thirty days of disapproval. Plaintiffs therefore request that the court require the EPA to either approve or disapprove Alaska's submission of water quality limited segments within ninety days of April 1, 1992, and if the EPA disapproves the list, require the EPA to create its own list and priority ranking within thirty days of disapproval.

The EPA has agreed to plaintiffs' schedule.[6] *See,* Attachment to Supplemental Declaration of Richard G. Albright, "Memorandum of Understanding Between the United States Environmental Protection Agency and the State of Alaska Regarding Implementation of Section 303(d) of the Clean Water Act: Total Maximum Daily Loads," (hereinafter, "MOU"), at 2, ¶¶ 2, 3. In light of the extended period of time during which no action was implemented by the EPA, however, the court finds that the agreed schedule is necessarily included as a requirement of this court's order.

*B. Schedule for the Development of TMDLs.*

█ The MOU provides that by April 3, 1993, the EPA and the State will complete waterbody/watershed assessments for the following: (1) two specific waterbodies affected by pollution from pulp mills; (2) two specific waterbodies affected by pollution from seafood processing; (3) two, as yet unidentified, waterbodies with urban runoff as the primary pollutant source; (4) one, as yet unidentified, waterbody affected by placer mining; and, (5) by January 31, 1994, one waterbody or watershed affected by logging or other "forest practice activity." MOU, at 3–6, ¶ 4(a)–(c).

Each waterbody/watershed assessment will determine either:

(1) that existing regulatory requirements will ensure achievement of water quality standards, and therefore a TMDL is unnecessary; or

(2) that development of a TMDL is appropriate. MOU, at 4, ¶ 4(c). Where TMDLs are deemed appropriate, the State and the EPA will establish TMDLs within fifteen months, by June 30, 1994. MOU, at 4, ¶ 4(c).[7] The MOU further provides that beginning in the State fiscal year of 1995, subsequent TMDLs will be negotiated annually between the EPA and the State. MOU, at 6, ¶ 4(d).

This schedule, however, goes no further than to provide assurance that eight waterbodies designated as water quality limited segments will be studied over the course of the next year. Congress intended that TMDLs be established for all waterbodies designated as water quality limited segments. Section 303(d)(1)(C) of the CWA states without qualification that "[e]ach State shall establish for the waters identified ... [as water quality limited segments] the total maximum daily load for those pollutants which the Administrator identifies ..." 33 U.S.C. § 1313(d)(1)(C). The MOU provides no assurance that TMDLs will in fact be established for the waters to be studied under the MOU, and no assurance that TMDLs will be established for any other water quality limited segments.

The EPA contends that because the CWA only provides an express statutory deadline for the submission of the first TMDL, the Agency and the State are left with considerable discretion to determine the subsequent pace of TMDL development. Robert Burd, Director of the EPA Region X's Water Division, justifies in de-

---

6. The revised list submitted by Alaska on April 1, 1992 adds 17 waters that were not included in the 1990 list. These additional water quality limited segments are primarily affected by urban runoff and placer mining. The 1992 list also deletes 26 waters that were designated on the 1990 list, with the explanation that these waters either: (1) now meet water quality standards; (2) are expected to be brought into compliance with water quality standards by existing control mechanisms; (3) or do not meet the State's changed criteria for listing. Although

Alaska has not yet provided the supporting documentation for their list, the EPA "recognizes that extended delay in receiving this material would not be an excuse for indefinite delay by EPA in acting on the State's list." Defendants' Reply to Plaintiffs' Supplemental Memorandum, at 6, n. 6.

7. This deadline, presumably, does not apply to the waterbody affected by logging, for which a TMDL would be established by early 1995.

tail why the EPA has not made the implementation of a TMDLs program a priority, despite the statutory requirement to do so. Affidavit of Robert Burd, at 4–7, Exhibit 3, Defendants' Opposition to Plaintiffs' Motion to Compel. Mr. Burd points to the EPA's other worthwhile water quality programs, and explains that the EPA "must retain the ability, notwithstanding statutory deadlines, to respond to future environmental crises by shifting available resources away from other tasks." *Id.* at 7.[8]

The EPA asserts that the MOU does establish a schedule for the development of TMDLs over the next two years. Citing *Arkansas v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 1046, 1059–60, 117 L.Ed.2d 239 (1992), the EPA further contends that its interpretation of the statutory duty to initiate a TMDLs program is entitled to substantial deference, and must be accepted if based on a permissible construction of the statute.

In *Arkansas v. Oklahoma,* the Supreme Court noted that the achievement of state water quality standards is one of the CWA's central objectives. —— U.S. ——, 112 S.Ct. 1046, 1056, 117 L.Ed.2d 239 (1992). In the context of reviewing the EPA's interpretation of a State's water quality standards, the Court held that "the EPA's reasonable, consistently held interpretation of those standards is entitled to substantial deference." *Id.* at ——, 112 S.Ct. at 1059.

The EPA's reliance on *Arkansas v. Oklahoma* to invoke judicial deference to agency decision-making is misplaced in this instance. The only "consistently held interpretation" that the EPA has demonstrated with respect to the CWA's TMDL requirements has been to ignore them. Such "interpretation" is clearly not "reasonable" within the meaning of *Arkansas v. Oklahoma.* This court is neither failing to give due regard to the EPA's interpretation of its own regulations, nor substituting its own factual findings for those of the Agen-

cy in rejecting the EPA's contention that the "schedule" set forth in the MOU for the establishment of TMDLs satisfies the CWA's requirements. *See, Arkansas v. Oklahoma,* —— U.S. at ——, 112 S.Ct. at 1060–1061.

The court is mindful not to intrude upon the Agency's realm of discretionary decision-making. The court adopts in full the MOU, and will not disturb the EPA's determination of the appropriate short-term schedule for the study and possible establishment of TMDLs. The court also recognizes, however, that standing alone the MOU will not secure faithful compliance with the CWA.

■ The role of the court is to interpret as faithfully as possible the intent of Congress. Congress established an accelerated schedule for the first identification of water quality limited segments and for the adoption of the first TMDLs. 33 U.S.C. §§ 1313(d)(1)(A), 1313(d)(2). A state's inaction triggers the EPA's affirmative duty to step into the state's role and begin the TMDLs process. *See, Alaska Center for Env't,* 762 F.Supp. at 1429. Congress also expressly stated that TMDLs were to be established for all waters designated as water quality limited segments. 33 U.S.C. § 1313(d)(1)(C). The responsibility of the court is to ensure prompt and attentive adherence to the mandate of the CWA.

■ In this case, almost thirteen years have passed since the expiration of the statutory deadline for the first submission of a TMDL in Alaska. When the intent of Congress clearly requires the Agency to act without undue delay, courts have the authority to order the EPA to establish a reasonable schedule in which to achieve compliance. *See, Abramowitz v. Environmental Protection Agency,* 832 F.2d 1071, 1078–79 (9th Cir.1987) (finding that the court had the authority under the Clean Air Act to set the deadline by which the EPA had to act on a state's proposed carbon

---

**8.** Mr. Burd's affidavit implies that time and resource limitations within the Agency prevented the EPA from attending to the TMDLs program. Limitations faced by the EPA, however, appear to be largely self-imposed, as the EPA did not

request *any* funds for its TMDLs program for fiscal year 1992. EPA, "BUD–2; EPA Program Element Pricing Analysis," at 3–151, Exhibit B, Plaintiffs' Reply in Support of Motion to Compel.

monoxide and ozone controls); *Natural Resources Defense Council, Inc. v. New York State Dep't of Envtl. Conservation*, 700 F.Supp. 173, 177–181 (S.D.N.Y.1988) (ordering the EPA to establish a schedule for New York's compliance with the Clean Air Act); *Environmental Defense Fund v. Thomas*, 627 F.Supp. 566, 569–570 (D.D.C. 1986) (finding that the EPA had a duty to set deadlines for compliance). Indeed, the EPA's own regulations require that "[s]chedules for submission of ... TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1).

The court finds that the CWA requires the EPA to work with the State of Alaska to establish a reasonable schedule for the development of TMDLs for all waterbodies designated as water quality limited segments. While such a schedule may provide more specific deadlines for the establishment of a few TMDLs for well-studied water quality limited segments in the short-term, and set only general planning goals for long-term development of TMDLs for water quality limited segments about which little is known, a proposal for the establishment of TMDLs must encompass all listed water quality limited segments. The EPA, with a showing of good cause, may request leave of court to deviate from the schedule at some future date. The EPA shall propose such a schedule within ninety days of approval or disapproval of Alaska's April of 1992 list of water quality limited segments.

## C. Identification of Heavily Polluted Waters in Alaska.

█ Plaintiffs contend that there is currently insufficient ambient water quality monitoring in Alaska to identify all water quality limited segments. Plaintiffs are concerned that the EPA will attempt to implement a TMDLs program without sufficient data. By requiring the Agency to address monitoring data deficiencies, ACE hopes to ensure that the EPA has the proper tools for a successful TMDLs program. Plaintiffs request that the court require the EPA to prepare a report on ambient water quality monitoring in Alaska.

The EPA argues that this requirement would, in effect, require the court to review the content of the Agency's actions. The EPA contends that this is beyond the court's jurisdiction. Because Section 505(a) of the CWA grants a court authority only to order the Administer to perform a non-discretionary act or duty, the EPA reasons that the court lacks the authority to require that the EPA's regulatory actions be submitted for the court's review and approval. *See, Environmental Defense Fund v. Thomas*, 870 F.2d 892, 899–900 (2nd Cir.1989), *cert. denied*, 493 U.S. 991, 110 S.Ct. 537, 107 L.Ed.2d 535 (1989) (holding that the court could compel the EPA to take final action with respect to national air quality standards, but it lacked jurisdiction to require the EPA to revise the standards to limit particular pollutants).

Although this court lacks the authority to require the EPA to perform specific ambient water quality monitoring, the court does have broad discretion in fashioning appropriate injunctive relief. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982) (the CWA citizen suit provision "permits the district court to order the relief it considers necessary to secure prompt compliance with the Act"); *see also, Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir.1990) ("[o]nce plaintiffs establish they are entitled to injunctive relief, the district court has broad discretion in fashioning a remedy").

In light of the EPA's thirteen-year delay in implementing a TMDLs program in Alaska, the court finds that a limited amount of judicial guidance is appropriate. The court therefore requires that the EPA prepare a report on ambient water quality monitoring. The determination of what, if any, water quality monitoring would be both appropriate and practicable is left to the Agency's discretion.

In its report, the EPA should: (1) identify and describe all material gaps in existing data gathering efforts by public and private entities regarding the extent and trends in water pollution due to logging,

mining, sea food processing, urban development, oil and gas development, and agriculture; (2) identify the measures which could be taken by the EPA, and other state and federal agencies, to fill such gaps in the existing data; (3) discuss the practicability of implementing such measures; (4) and address whether the ambient water quality monitoring being conducted now (or that will be required in the future) is (or will be) sufficient to determine whether Alaska's water quality standards are being violated.

The EPA shall submit its report to the court within one year from the date on which the EPA approves or disapproves Alaska's April of 1992 water quality limited segments.[9] Within thirty days of its submission of the report, the EPA shall propose a schedule for the implementation of water quality monitoring measures identified as appropriate. The EPA, with good cause shown, may request leave of court to change its determination of appropriate monitoring measures and/or the schedule for their implementation.

## D. Judicial Oversight.

Plaintiffs request that the court retain jurisdiction over this case for at least five years from the date of this order. Plaintiffs also propose that on or before the expiration of the five-year period, plaintiffs and defendants each submit a status report addressing whether the court should retain jurisdiction for an additional period. ACE explains that judicial oversight is required due to the complexity of the relief granted and to ensure that the substantive terms of the order are faithfully and properly implemented.

Retaining jurisdiction to ensure compliance with the court's order is within the court's equitable discretion to fashion appropriate relief. *United States v. Metropolitan Dist. Comm'n*, 930 F.2d 132 (1st Cir.1991) (upholding fifteen-year compliance plan in a federal CWA suit against municipalities polluting Boston Harbor). In light of the EPA's past intransigence and the EPA's more recent, tentative steps

to begin the TMDLs process, this court will retain jurisdiction over this matter during its initial stages to ensure compliance with this court's order. Two years from the date of this order, the parties shall submit to the court a joint status report. On this basis, the court shall determine whether to retain jurisdiction for an additional period.

## III. CONCLUSION

The state of Alaska has a mandatory duty under the CWA to identify water quality limited segments and set TMDLs for them. The EPA also has a nondiscretionary duty to ensure the state's compliance with these terms, or to initiate its own TMDLs process if Alaska fails to do so. In addition, the EPA must set a schedule for the implementation of the TMDLs process.

It is hereby ORDERED, ADJUDGED, and DECREED that:

(1) the EPA shall review Alaska's revised April of 1992 list and priority ranking of water quality limited segments and, within 90 days of April 1, 1992, the EPA shall either approve or disapprove the list;

(2) in the event that the EPA disapproves Alaska's list, the EPA shall promulgate its own list and priority ranking of water quality limited segments within 30 days of disapproval;

(3) within 90 days of the EPA's approval or disapproval of Alaska's list of water quality limited segments, the EPA shall propose a schedule for the establishment of TMDLs for all waters designated as water quality limited;

(4) within one year of the EPA's approval or disapproval of Alaska's list of water quality limited segments, the EPA shall submit to the court its report on ambient water quality monitoring;

(5) within 30 days of the submission of the report, the EPA shall propose a schedule for the implementation of those measures identified as appropriate and practicable in its report; and,

---

**9.** If the EPA finds that one year to complete a report on ambient water quality monitoring is

impracticable, the EPA may so present to the court.

(6) two years from the date of this Order, the parties shall submit to the court a joint status report, on which basis the court shall determine whether to retain jurisdiction for an additional period.