**IDAHO SPORTSMEN'S COALITION, et al., Plaintiffs,**

**v.**

**Carol M. BROWNER, et al., Defendants.**

**No. C93–943WD.**

United States District Court, W.D. Washington, Seattle.

Sept. 26, 1996.

Todd D. True, Victor M. Sher, Katherine S. Poole, Sierra Club Legal Defense Fund, Seattle, WA, for plaintiffs.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Adrianne Kline Allen, U.S. Environmental Protection Agency, Seattle, WA, David Aiken Carson, U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, Natalie M. Duval, U.S. Department of Justice, Environmental De-

fense Section, Washington, DC, for defendants.

Grant S. Degginger, Lane, Powell, Spears, Lubersky, Seattle, WA, for Associated Logging Contractors Inc., a non-profit corporation, amicus.

Clive James Strong, Idaho Atty. Gen. Office, Boise, ID, for State of Idaho, amicus.

Steven D. Robinson, Karr Tuttle Campbell, Seattle, WA, Bruce M. Smith, Rosholt, Robertson & Tucker, Boise, ID, for Intermountain Forest Industry Ass'n, Shearer Lumber Products.

Michael K. Vaska, Foster Pepper & Shefelman, Seattle, WA, Albert P. Barker, Don A. Olowinski, Hawley, Troxell, Ennis & Hawley, Boise, ID.

## ORDER ON EPA'S MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR ORDER ESTABLISHING TMDL SCHEDULE

DWYER, District Judge.

## I. BACKGROUND

This is a citizen suit brought under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.*, for declaratory and injunctive relief compelling the defendants (collectively the Environmental Protection Agency or "EPA") to perform certain duties required by the CWA as steps toward ridding Idaho's rivers, streams, and other waterbodies of pollution. In their first amended complaint, plaintiffs Idaho Sportsmen's Coalition and Idaho Conservation League sought judgment directing the EPA to compile a list of "water quality limited segments" ("WQLSs"), *i.e.*, waterbodies in Idaho that do not, or may not, comply with applicable water quality standards. Plaintiffs now seek judgment requiring the EPA to develop a "total maximum daily load" ("TMDL") of pollutants for each WQLS. Four parties have been granted leave to intervene: Clean Water for Idaho, Inc.; Intermountain Forest Industry Assn.; Potlatch Corp., Inc.; and Shearer Lumber Products. In addition, the State of Idaho and Associat-

ed Logging Contractors, Inc., have appeared as *amici curiae*.

On April 14, 1994, an order was entered granting plaintiffs' motion for partial summary judgment on the WQLS listing issue (Dkt. # 140). The order noted that Idaho submitted no WQLS list to the EPA until 1989, seventeen years after the Clean Water Act became law and ten years after the statutory due date. The EPA neither approved nor disapproved the 1989 list. In 1992 Idaho submitted a second list; a year later—although action within thirty days was required by statute—the EPA approved it. The court determined that the EPA's approval of Idaho's 1992 WQLS list, which included only thirty-six threatened and degraded waters although hundreds manifestly existed, was contrary to law. The order directed the EPA to promulgate a WQLS list for Idaho. In compliance with the order, the EPA in October 1994 identified *962* Idaho WQLSs.

The next step under the CWA was to be the development of TMDLs for the WQLSs. In 1995, both sides moved for summary judgment on that issue. The court, granting plaintiffs' motion in part, found that "the EPA has failed to perform its statutory and regulatory duty to determine, with Idaho, a reasonable schedule for the development of TMDLs for all waterbodies designated as WQLSs." Order dated May 19, 1995 (Dkt. # 233), at 14. The court declined to order the EPA to develop the TMDLs without Idaho's participation; instead, the EPA was directed to perform its statutory duty in cooperation with Idaho and to file "a complete and duly-adopted reasonable schedule" within one year.

EPA now moves for dismissal of the case, contending that it has complied with the May 1995 order by approving a "complete and reasonable" schedule for the development of "all necessary TMDLs" in Idaho. The proposed schedule is set out in an exchange of letters between the EPA and the State of Idaho. It calls for the TMDL process to go on until at least the year 2021—that is, for twenty-five more years. Plaintiffs oppose the motion to dismiss, contending that the proposed schedule complies neither with the

court's order nor with the Clean Water Act. They seek an order requiring EPA to develop TMDLs for all Idaho's WQLSs by December 31, 2000. This request is, in substance, a cross-motion for partial summary judgment, and has been fully briefed. Intervenor Clean Water for Idaho, an industry-sponsored entity, supports the EPA's proposal in general, but opposes any deadline for completion of the TMDL listing process. The other intervenors have not filed briefs on the present motions. The State of Idaho, as *amicus curiae*, supports the EPA's position.

There is no genuine issue of material fact for trial within the meaning of Fed.R.Civ.P. 56, and summary judgment may be entered. All materials filed, and the arguments of counsel presented in open court, have been fully considered. The plaintiffs' standing to sue, and the standard of review, have been discussed in the April 1994 and May 1995 orders. Accordingly, this order will deal with the applicable provisions of the Clean Water Act, the EPA's proposed schedule, whether the EPA has complied with the law, and the remedy.

## II. THE CLEAN WATER ACT

In *Alaska Center for the Environment v. Reilly,* 762 F.Supp. 1422 (W.D.Wash.1991) (*"ACE I"*), dealing with the same Clean Water Act provisions, the district court wrote a summary that was later adopted by the Ninth Circuit in *Alaska Center for the Environment v. Browner,* 20 F.3d 981 (9th Cir. 1994) (*"ACE III"*). It is worth repeating here:

> Congress passed the Federal Water Pollution Control Act (commonly referred to as the CWA) in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Sec. 101(a), 33 U.S.C. § 1251. In order to achieve that objective, Congress declared as a "national goal" that "the discharge of pollutants into the navigable waters be eliminated by 1985." *Id.,* § 101(a)(1).
>
> EPA's regulatory program for water protection focuses on two potential sources of pollution: point sources and nonpoint sources. Point source pollution was addressed in the 1972 amendments to the Act, where Congress prohibited the discharge of any pollutant from any point source into certain waters unless that discharge complies with the Act's specific requirements. Secs. 301(a) and 502(12), 33 U.S.C. §§ 1311(a) and 1362(12). Under this approach, compliance is focused on technology-based controls for limiting the discharge of pollutants through the National Pollution Discharge Elimination System ("NPDES") permit process.
>
> When these requirements are found insufficient to clean up certain rivers, streams or smaller water segments, the Act requires use of a water-quality based approach. States are required to identify such waters and designate them as "water quality limited." The states are then to establish a priority ranking for these waters, and in accordance with that ranking, to establish more stringent pollution limits called "total maximum daily loads" or "TMDLs." 33 U.S.C. §§ 1313(d)(1)(A), (C). TMDLs are the greatest amount of a pollutant the water body can receive daily without violating a state's water quality standard.
>
> The TMDL calculations help ensure that the cumulative impacts of multiple point source discharges are accounted for, and are evaluated in conjunction with pollution from other nonpoint sources. States are then required to take whatever additional cleanup actions are necessary, which can include further controls on both point and nonpoint pollution sources.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Under § 303(d), states are required to submit lists of water quality limited segments and TMDLs to the EPA at certain times; the first such submission was due by June 26, 1979. Once such a submission is made, certain mandatory duties by EPA are triggered. *Within 30 days,* the EPA Administrator must review the state's submissions of the identified waters and the load allocations established under § 303(d)(1). Once approved by EPA, the identified waters and TMDLs are incorporated by the state into its continuing planning process established under § 303(e)(3).
>
> If EPA disapproves the identification and/or TMDL, the agency has 30 days after disapproval to make its own identifi-

cation of waters and establish TMDLs necessary to implement the applicable water quality standards. § 303(d)(2).

\* \* \* \* \* \*

Section 505(a) of the CWA authorizes citizens to bring suit in federal court against the EPA for failing to perform an "act or duty" under the CWA which is not discretionary. 33 U.S.C. § 1365(a).

*ACE I* at 1424–26 (emphasis in original).

The citizen suit provision is meant to "aid in enforcement of the Act." *ACE III* at 983.

## III. THE PROPOSED SCHEDULE

TMDL development in itself does not reduce pollution. It is only a step toward bringing WQLSs into compliance with water quality standards; TMDLs inform the design and implementation of pollution control measures. The EPA describes TMDLs as "a tool for implementing State water quality standards. . . . [that provides] the basis for States to establish water quality-based controls." "Guidance for Water Quality Based Decisions: The TMDL Process," EPA Office of Water Regulations, April 1991 at 1. The TMDL process provides "[a] rational method for weighing the competing pollution concerns and developing an integrated pollution reduction strategy for point and non-point sources." *Id.* at 15.

Under the EPA's proposed schedule, Idaho would develop "all necessary TMDLs" by the year 2021. The EPA and Idaho argue that to develop TMDLs for all WQLSs would be premature because the state has not monitored and assessed most of them. The proposed schedule thus contains short-term goals for developing TMDLs for certain high priority waters (while omitting others), and calls for monitoring and assessment of other listed waters. Idaho would prepare TMDLs for forty-three waters between now and 1999. It would submit twelve more TMDLs, two for each of the state's six basins, to the EPA every two years beginning in 1997. Idaho would monitor WQLSs, remove those in attainment of water quality standards from the WQLS list, and evaluate impaired waters to determine whether existing pollution controls would implement water quality standards. It would develop TMDLs only for WQLSs that it found would not attain standards through application of existing pollution controls. The EPA would evaluate Idaho's progress at five-year intervals. Reliance is placed upon other Idaho programs meant to improve water quality, e.g., nutrient management plans, an agricultural water quality program, and lake management plans. These would be treated, in effect, as substitutes for TMDL development.

Even though the proposed schedule would extend over a quarter-century, it would not assure "all necessary" TMDL development unless hundreds of WQLSs were to fall off the list.

## IV. LEGAL DEFICIENCIES

The EPA's proposed schedule for TMDL development in Idaho violates the CWA because of two flaws.

■ The first is its extreme slowness. The CWA declares as a national goal the elimination of pollutant discharges into navigable waters by the year 1985. 33 U.S.C. § 1251(a)(1). The first TMDLs were due from states in 1979. *See* 33 U.S.C. § 1313(d)(2). The EPA was given thirty days to review state submissions, and thirty more days to promulgate substitute TMDLs if necessary. *Id.* Congress provided that TMDLs might incorporate "a margin of safety which takes into account any lack of knowledge," 33 U.S.C. § 1313(d)(1)(C), showing that a lack of precise information must not be a pretext for delay:

Although these tight deadlines might mean that initially established TMDLs would be based on less than ideal data, that fact was considered and addressed by Congress, as demonstrated by the statutory direction to use "a margin of safety which takes into account any lack of knowledge." [33 U.S.C.] § 1313(d)(1)(C). As expressed by an EPA employee, "In other words, Congress says ignorance is no excuse for inaction. Just add a margin of safety to compensate for the lack of knowledge and keep moving." *ACE,* 762 F.Supp. at 1429 (quoting Thomas Wilson, Chief of the Office of Water Planning, EPA Region X, EPA Nonpoint Source News–Notes, October 1990, at 20).

*Natural Resources Defense Council, Inc. v. Fox,* 909 F.Supp. 153, 157–58 (S.D.N.Y.1995).

The role of TMDLs in the CWA strategy for improving water quality confirms that they were to be developed quickly. TMDLs provide a basis for developing other pollution control measures where technology-based point source controls prove inadequate. 33 U.S.C. §§ 1313(d)(1)(A), (C). To serve their intended purpose, they must be available early in the development of a state's program.

In the seventeen years since 1979, Idaho has completed only three TMDLS. Under the proposed schedule at least twenty-five more years would go by before the remaining TMDLs were developed. The net result would be to put off for another generation a step that Congress required be taken years ago. And even the twenty-five-year marker could well be missed. The schedule sets only "expected" times and "targets," not firm dates. Even recognizing that a TMDL may cover more than one WQLS, at Idaho's proposed submission rate the twenty-five years could easily turn into fifty or seventy-five. Although courts have allowed additional time when CWA deadlines are missed, nothing in the law could justify so glacial a pace.

The EPA relies upon a statement in *ACE II,* quoted in the May 1995 order herein, that "a schedule may provide more specific deadlines for the establishment of a few TMDLs for well-studied water quality limited segments in the short-term, and set only general planning goals for long-term development of TMDLs for water quality limited segments about which little is known...." *Alaska Center for the Environment v. Reilly,* 796 F.Supp. 1374, 1380 (W.D.Wash.1992), *aff'd,* 20 F.3d 981 (9th Cir.1994). But the context must be borne in mind. Congress prescribed early deadlines for the TMDL process. "Short-term" and "long-term" at most can mean months and a few years, not decades. Nothing could justify a schedule so slow as to defeat the CWA's goals; yet that is what the EPA's proposal for Idaho would do.

■ The second flaw is that the proposed schedule makes no provision for TMDL development for the full list of Idaho WQLSs. Instead, the schedule simply assumes that the list is wrong, i.e., that monitoring and evaluation will massively reduce it.

But WQLSs are, by definition, waterbodies that are not expected to attain applicable water quality standards through application of existing pollution controls. 33 U.S.C. § 1313(d)(1)(A), 40 C.F.R. § 130.7(b). The CWA requires that a TMDL be proposed for every WQLS. 33 U.S.C. § 1313(d)(1)(C); *Scott v. City of Hammond,* 741 F.2d 992, 996–97 (7th Cir.1984); *ACE II,* 796 F.Supp. at 1378. Accordingly, the May 1995 order herein required that the schedule "encompass all listed water quality limited segments." (Dkt. # 233 at 4). That has not been done.

It is true that WQLS lists are dynamic and that states may delist ·waters that attain standards. It is possible that some of the 962 Idaho WQLSs will drop off the list as knowledge is gained and conditions change. But that possibility does not entitle the EPA or the state simply to assume that the list will dwindle by hundreds of waterbodies, or to treat the hoped-for results of state programs as a substitute for CWA compliance. The CWA requires that the full WQLS list, even though it may be amended later, be the basis for TMDL development. The proposed schedule manifestly fails to meet that requirement.

■ As noted above, the plaintiffs have sued under both the CWA and the APA. Under the CWA, the EPA has a mandatory duty, if it disapproves a state's TMDL submission, to establish the TMDLs itself within thirty days. Under the APA, the court may compel agency action unlawfully withheld or unreasonably delayed, and a discretionary act may be set aside if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §§ 706(1) and (2); *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 980–81 (9th Cir.1985). Here, the EPA's approval of Idaho's proposed TMDL schedule is arbitrary, capricious, and an abuse of discretion.

## V. REMEDY

■ The EPA remains in dereliction of its statutory and regulatory duty to determine, with Idaho, a reasonable schedule for the development of TMDLs for all waterbodies designated as WQLSs. The question is what the remedy should be. As stated in *ACE II:*

Congress established an accelerated schedule for the first identification of water quality limited segments and for the adoption of the first TMDLs. 33 U.S.C. §§ 1313(d)(1)(A), 1313(d)(2).... Congress also expressly stated that TMDLs were to be established for all waters designated as water quality limited segments. 33 U.S.C. § 1313(d)(1)(C). The responsibility of the court is to ensure prompt and attentive adherence to the mandate of the CWA. *Id.* at 1379.

When an agency "does not reasonably accommodate the policies of a statute or reaches a decision that is 'not one that Congress would have sanctioned,' ... a reviewing court must intervene to enforce the policy decisions made by Congress." *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1326 (D.C.Cir.1988) (citations omitted), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). The Supreme Court has held that the citizen suit provisions of the Clean Water Act allow a district court to "order the relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982). As the Ninth Circuit noted in *ACE III*, "[t]he district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong." 20 F.3d at 986. Relief should be tailored to serve congressional. objectives, but the court must be careful not to intrude upon the agency's realm of discretionary decision making. *Id.* at 986–87.

Intervenor Clean Water for Idaho argues that the EPA is powerless to set any schedule for a state's TMDL submissions, since the CWA contains no final TMDL deadline. An EPA regulation requires that "[s]chedules for submission of TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1). This regulation derives from Congress's direction that states submit TMDLs "from time to time" under 33 U.S.C. § 1313(d). The Ninth Circuit has recognized that the EPA's authority under the CWA is not circumscribed by the

Act's explicit requirements. *See Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1527–28 & n. 14 (9th Cir.1995) (" '[T]he Clean Water Act vests in the EPA and the States broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution.' "). *Id.* at 1528 (citation omitted). The EPA has authority to set, with the state, a schedule to complete the TMDL process; the CWA's enforcement history makes clear that a firm schedule is vital.

Plaintiffs contend that Idaho's proposed schedule, and the state's weak performance to date, are so deficient as to constitute a "constructive submission" of no TMDLs, thus triggering EPA's mandatory duty to develop the TMDLs itself. *See Scott, supra* (constructive submission found where the states of Illinois and Indiana failed to submit any TMDLs for Lake Michigan); *ACE I, supra* (constructive submission found where Alaska failed to submit any TMDLs for over a decade); *cf. Sierra Club v. Browner*, 843 F.Supp. 1304 (D.Minn.1993) (no constructive submission where EPA had approved forty-three TMDLs submitted by Minnesota, and the state had implemented some TMDLs).

On the present record a "constructive submission" has not yet occurred. A remedy must nevertheless be ordered. In devising a remedy the court faces "the difficult task of avoiding both remedies that may be too intrusive ... and those that may prove to be ineffective." *N.A.A.C.P. v. Secretary of Housing & Urban Dev.*, 817 F.2d 149, 159 (1st Cir.1987). Generally, when an agency has abused its discretion the appropriate remedy is a remand for further proceedings consistent with the court's ruling. *See Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20, 73 S.Ct. 85, 86–87, 97 L.Ed. 15 (1952). The plaintiffs urge that the court order the EPA to adopt a judicially-decided schedule for TMDL development. They propose a detailed and prioritized schedule calling for all TMDLs in Idaho to be developed by December 31, 2000. The EPA counters with declarations showing the difficulties and complexities of TMDL development; it does not, however, show that plaintiffs' schedule is impossible.[1] The available

---

1. Each side relies on expert declarations prepared for this litigation after the administrative action was taken. Under the APA, the focal point for judicial review is the administrative record in existence, not a new record made initially in the reviewing court. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir.1980). Evidence

remedies are to order a specific schedule now, or to remand. The EPA argues for the latter in its reply brief, stating:

> Should the Court determine that EPA's schedule does not comply with the Court's Order, the appropriate remedy is to remand to EPA, so that EPA can exercise its discretion to revise and reissue a proper schedule.

EPA's Reply Memorandum at 20.

The court agrees. Accordingly, it is ordered that:

1. The EPA's motion for dismissal is denied.

2. Plaintiffs' cross-motion for partial summary judgment is granted to the extent that the EPA's approval of Idaho's proposal for TMDL development, to extend over twenty-five years or more, is held to be arbitrary and capricious, an abuse of discretion, and contrary to law, and is hereby set aside.

3. Plaintiffs' motion for a ruling that a "constructive submission" of no TMDLs be found to have occurred is denied without prejudice to its renewal. The matter is remanded to the EPA with directions to establish with Idaho and file herein, within six months of the date of this order, a complete and duly adopted reasonable schedule for the development of TMDLs for all waterbodies designated as WQLSs in Idaho. The present record, which includes a recognition by all parties that a single TMDL may apply to several WQLSs in the same watershed, suggests that a completion time of approximately five years would be reasonable.

4. The court retains jurisdiction pending compliance with this order.

The clerk is directed to send copies of this order to all counsel of record.

outside the record may be considered for certain limited purposes, e.g., to explain the agency's action or to determine whether its course of inquiry was inadequate. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988). Those purposes are present here and the declarations may be considered.