**FRIENDS OF THE WILD SWAN, INC., Alliance for the Wild Rockies Inc., Ecology Center, Inc., American Wildlands, Inc., Montana Environmental Information Center Inc., Plaintiffs,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Carol Browner, Administrator, Jack McGraw, Region VIII EPA Administrator, Defendants,**

and

**State of Montana, ex rel. Department of Environmental Quality, Montana Wood Products Association, Montana Stockgrowers Association, and Montana Farm Bureau Federation, Intervenors.**

No. CV 97–35–M–DWM.

United States District Court,
D. Montana.
Missoula Division.

Nov. 5, 1999.

Order Amending Opinion,
Dec. 10, 1999.

Jack R. Tuholske, Missoula, MT, Jory Ruggiero, Bozeman, MT, for Friends of the Wild Swan, Alliance for the Wild Rockies, Ecology Center Inc., American Wildlands, plaintiffs.

Claudia L. Massman, Montana Department of Environmental Quality, Helena, MT, Jack R. Tuholske, Missoula, MT, Jory Ruggiero, Bozeman, MT, for Montana En-

vironmental Information Center Inc., plaintiff.

Deanne L. Sandholm, Office of the U.S. Attorney, Helena, MT, Daniel R. Dertke, U.S. Department of Justice—Environmental Defense Section, Washington, DC, Margaret J. Livingston, Associate Regional Counsel, U.S. Environmental Protection Agency, Denver, CO, for U.S. Environmental Protection Agency, Carol M. Browner, Jack Region VIII EPA Administrator, defendants.

John F. North, Claudia L. Massman, Montana Department of Environmental Quality, Helena, MT, Jane Amdahl, Dept. of Environmental Quality, Helena, MT, for State of Montana, ex rel. Department of Environmental Quality, intervenor defendant.

Rebecca W. Watson, Jeffrey M. Hindoien, Gough, Shanahan, Johnson & Waterman, Helena, MT, for Montana Wood Products Association, intervenor defendant.

Rebecca W. Watson, Jeffrey M. Hindoien, Gough, Shanahan, Johnson & Waterman, Helena, MT, John E. Bloomquist, Doney Crowley & Bloomquist, Helena, MT, for Montana Stockgrowers Association, Montana Farm Bureau Federation, intervenor defendants.

## ORDER

MOLLOY, District Judge.

The plaintiffs, Friends of the Wild Swan Inc., and four other environmental organizations, instituted this case against the Environmental Protection Agency ("EPA"), and the EPA's Administrator, Carol Browner, to compel the EPA to perform certain statutory duties required by section 303(d) of the Clean Water Act, 33 U.S.C. § 1251 et seq. ("CWA"). The law pertains to certain steps toward ridding Montana's rivers, streams and other waterbodies of pollution.

Plaintiffs challenge the EPA's administration of the CWA under three separate and distinct causes of action. The first is a claim against the EPA under section 505(a)(2) of the CWA for failure to perform a mandatory duty. The second advances a claim against the EPA under section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), for taking action that is arbitrary, capricious, and an abuse of discretion. The third involves the assertion under section 706(1) of the APA which allows a citizen to institute an action against the EPA for agency action unlawfully withheld or unreasonably delayed.

Four parties have been granted leave to intervene: the State of Montana Department of Environmental Quality ("DEQ"), the Montana Wood Products Association, the Montana Stockgrowers Association, and the Montana Farm Bureau Federation.[1]

Several motions are before me, including the following: (1) plaintiffs' motion for summary judgment with respect to all three claims; (2) the EPA's cross-motion for summary judgment; (3) the DEQ's cross-motion for summary judgment; (4) the association intervenors' cross-motion for summary judgment; (5) the EPA's motion to strike paragraphs 12–17 and 24–44 from the expert report of Dr. Jack Smith; (6) plaintiffs' motion to strike the supplemental affidavit of Stuart Lehman; and (7) plaintiffs' motion to strike the supplemental affidavit of Margaret J. Livingston. Having considered the arguments of the parties presented in their briefs and at oral argument, I am going to deny plaintiffs' motion for summary judgment on Counts I and II but grant them summary judgment on one part of Count III. In so doing, I am also granting the EPA and Browner's motions for summary judgment on Counts I and II but deny it on one part of Count III. I make the same determina-

1. For purposes of this Order the Montana Wood Products Association, Montana Stockgrowers Association and Montana Farm Bu-

reau Federation shall be collectively referred to as the "association intervenors."

tion regarding the intervenors' dispositive motions. The other motions are dealt with below.

## A. BACKGROUND

### (i) The Clean Water Act—Purpose and Scheme

Congress passed the Federal Water Pollution Control Act (commonly referred to as the CWA) in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *See* 33 U.S.C. § 1251. The CWA focuses on two potential sources of water pollution: point source pollution and nonpoint source pollution. A point source is "any discernible, confined, and discrete conveyance," including pipes, ditches, conduits, or vessels "from which pollutants are or may be discharged." *See* 33 U.S.C. § 1362(14). A nonpoint source is any non-discrete source, such as runoff from agriculture, forestry, and construction activity. *See Trustees for Alaska v. E.P.A.*, 749 F.2d 549, 558 (9th Cir.1984).

Two distinct strategies are used to regulate point source and nonpoint source pollution. Point source pollution is primarily regulated by the CWA through implementation of a National Pollutant Discharge Elimination System ("NPDES") permit process. *See* 33 U.S.C. § 1342. The technology-based NPDES permits set quantitative limits on the amount of pollutants released from each point source. *See* 33 U.S.C. § 1342.[2] Nonpoint source pollution is primarily regulated by the states through state water quality management plans. *See Oregon Natural Resources Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 (9th Cir.1987). States are supposed to submit assessment reports and management plans to the EPA for review, and the federal government assists the states through the dispersement of monetary grants. *See* 33 U.S.C. § 1329(a)(1), (b)(2).

### (ii) Section 303(d) of the Clean Water Act

Section 303(d) is a critical part of the CWA's pollution prevention and watershed protection mandate. Section 303(d) serves as an interface between the technology-based NPDES permits that regulate point source pollution and the state's regulation of nonpoint source pollution. Section 303(d) utilizes a water-quality based approach to insure that appropriate standards are in place for every impaired waterbody by establishing pollution limits that account for both point source and nonpoint source pollution. *See Alaska Ctr. for the Env't v. Reilly*, 762 F.Supp. 1422, 1424–26 (W.D.Wa.1991).

### (iii) Duties Imposed by Section 303(d) of the CWA upon the States and the EPA

Section 303(d) of the CWA imposes duties on both the states and the EPA. States are required to create ambient water quality standards for all of their waterbodies.[3] *See* 33 U.S.C. § 1313(a)–(c). States then identify all waterbodies within their boundaries for which technology-based effluent limitations alone are not stringent enough to implement the applicable water quality standards. *See* 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(b)(1). These waters are commonly referred to as "water quality limited segments" or simply "WQLSs". *See* 40 C.F.R. § 130.2(j). After identifying the WQLSs, the states are supposed to prioritize the WQLSs based on the severity of their pollution and their beneficial uses. *See* 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(b)(4). Pollution limits known as "total maximum daily loads" ("TMDLs") are supposed to be developed for each pollutant impairing each WQLS. *See* 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. 130.7(d)(1). TMDLs establish the maxi-

---

**2.** Under authority of the CWA, the EPA has delegated its duties to establish and administer the NPDES permit program to the states, who operate the program through their respective Departments of Environmental Quality. *See* 33 U.S.C. § 1342(b).

**3.** The water quality standards are established at levels necessary to protect the public health and welfare, and enhance the quality of interstate waters. *See* 33 U.S.C. § 1313(a)–(c).

mum amount of pollutants (both point source and nonpoint source) a WQLS can receive daily without violating the state's water quality standards.[4] *See* 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.2(i); 40 C.F.R. 130.7. TMDLs are developed for the WQLSs in accordance with their priority ranking. *See* 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1).

Lists of WQLSs and TMDLS developed by the states are supposed to be submitted to the Administrator of the EPA for approval. *See* 40 C.F.R. § 130.7. When a submission of WQLSs and TMDLs is made to EPA, then certain mandatory duties are imposed upon the EPA. The EPA must review the state's submission within 30 days. *See* 33 U.S.C. 1313(d)(2). If approved, the identified WQLSs and TMDLs are incorporated into the state's water-quality management plan under section 303(e).[5] *See* 33 U.S.C. § 1313(d), (e). If the EPA disapproves of the WQLSs identified and/or the TMDLs developed, the EPA inherits a mandatory duty to identify appropriate WQLSs and develop TMDLs compatible with the state's water quality standards within 30 days from the date of the disapproval. *See* 33 U.S.C. § 1313(d)(2).

### (iv) *Initial Lists of WQLSs and TMDLs, and Subsequent Revised Lists*

The CWA required that initial lists of WQLSs and TMDLs be submitted to the EPA no later than 180 days from the date the EPA published a list of pollutants suitable for TMDL calculation. *See* 33 U.S.C. § 1313(d)(2). The EPA published the referenced list of pollutants on December 28, 1978. *See* 43 Fed.Reg. 60662 (1978). Accordingly, all states were to submit their initial lists of WQLSs and corresponding TMDLs to the EPA on or before June 26, 1979. The CWA provides that revised lists of WQLSs and TMDLs must be submitted to the EPA "from time to time." *See* 33 U.S.C. § 1313(d)(2). EPA regulations promulgated in 1992 require states to submit revised lists of WQLSs and TMDLs on every even numbered year. *See* 40 C.F.R. § 130.7(d)(1). These requirements are at the heart of this lawsuit.

### (v) *Montana's Efforts to Implement Section 303(d) of the CWA*

From 1979 until 1992, Montana's response to its section 303(d) duty was limited to the collection and assessment of water quality data with respect to certain waterbodies. During that thirteen-year span, Montana did not submit a single WQLS or TMDL to the EPA for approval.

In 1992, Montana hired a TMDL coordinator and began the process of submitting lists of WQLSs and TMDLs to the EPA. Montana's 1992 submission contained a list of 322 WQLSs, based upon a partial assessment of Montana's waterbodies. The submission did not describe any TMDLs for the 322 WQLSs identified. Since 1992, Montana has revised its lists of WQLSs and TMDLs every two years, with submissions in 1994, 1996 and 1998. The 1994 submission identified 858 WQLSs, but no TMDLs. The 1996 submission identified approximately 900 WQLSs and 1 TMDL.[6]

---

4. A TMDL includes the sum of pollution from nonpoint sources and natural background sources (called load allocations) and pollution from point sources (called wasteload allocations), plus a margin of safety which takes into account any lack of knowledge. *See* 40 C.F.R. § 130.2(g), (h), (i); 40 C.F.R. 130.7(c)(1). A TMDL also takes into account seasonal variations in a waterbody. *See* 33 U.S.C. § 1313(d)(1)(C).

5. The CWA requires each state to have a plan for meeting the CWA's requirements that is approved by the EPA. *See* 33 U.S.C. § 1313(e).

6. The TMDL submitted in 1996 was a complex nonpoint source TMDL pertaining to Deep Creek. The parties disagree on whether the TMDL should be characterized as a single TMDL or three separate TMDLs. The EPA characterizes the TMDL as 3 separate TMDLs—one each for flow, temperature and sediment. The plaintiffs and the DEQ refer to the Deep Creek TMDL as a single TMDL. For purposes of this Order, I assume the Deep Creek TMDL constitutes a single TMDL.

The 1998 submission identified approximately 900 WQLSs, and 130 TMDLs.[7] Each submission made by Montana was approved by the EPA. The WQLSs identified in 1998 were based on an incomplete assessment of Montana's waterbodies. The TMDLs identified in 1998 constitute a small fraction of the TMDLs that will need to be developed for the WQLSs identified in 1998. The EPA estimates that an additional 3000 TMDLs will need to be developed because 3 to 4 pollutants impair each of the approximately 900 WQLSs identified.

### (vi) Deadlines for TMDL Development Imposed by State Law

On May 5, 1997, the Montana Legislature passed House Bill 546 which sets deadlines for the development of TMDLs in Montana. See Mont.Code Ann. § 75–5–702. Section 703 of Title 75 requires the state to develop TMDLs by the year 2007 for all impaired waterbodies identified in 1996. See Mont.Code Ann. § 75–5–703(3). To accomplish this task, the DEQ developed a schedule on May 5, 1998, that commits Montana to a three phase TMDL development. Under Phase 1, Montana will develop TMDLs for all high and medium priority waterbodies identified on Montana's 1996 list of WQLSs, as well as certain low priority waterbodies. Under Phases 2 and 3, Montana will develop TMDLs for all remaining waterbodies identified on the 1996 list. When new WQLSs are added, the schedule provides that TMDLs will be developed for the new WQLSs within 10 years of their disclosure.

### (vii) The Present Action

Dissatisfied with the efforts of Montana and the EPA in implementing the mandates of section 303(d) of the CWA, plaintiffs instituted the present action more than a quarter of a century after the law was enacted during President Richard M.

Nixon's administration, seeking, inter alia, an order compelling the EPA to identify all of Montana's WQLSs and develop appropriate TMDLs within the next three years.

### B. DISCUSSION

#### 1. The Cross–Motions for Summary Judgment

#### (i) (Count 1)—Claim Based Upon Section 505(a)(2) of the CWA

Section 505(a)(2) of the CWA authorizes citizens to institute actions in federal court against the EPA for failure to perform any act or duty under the CWA that is not discretionary with the EPA. See 33 U.S.C. § 1365(a)(2). Plaintiffs contend the EPA is subject to section 505(a) liability because it breached a mandatory duty under section 303(d) of the CWA, to identify Montana's WQLSs and develop corresponding TMDLs. Plaintiffs argue the mandatory duty arose under two alternative theories: (1) a "constructive submission" theory; and (2) "inadequate state action".

#### (a) Constructive Submission Theory

■ Beginning with the 7th Circuit case in Scott v. City of Hammond, Ind., 741 F.2d 992 (7th Cir.1984), federal courts have generally held that a state's failure to submit lists of WQLSs and TMDLs, over a long period of time, constitutes a "constructive submission" by the state that no WQLSs exist and that no TMDLs are necessary, thus triggering a mandatory duty upon the EPA under section 303(d) to disapprove of the constructive submission and, upon disapproval, to promulgate its own WQLSs and TMDLs. See, Sierra Club v. Hankinson, 939 F.Supp. 865, 868 (N.D.Ga.1996). Cognizant of this rule, plaintiffs argue that Montana's failure to submit a list of WQLSs to the EPA from

---

7. Prior to 1997, Montana developed 129 point source TMDLs as part of the "Statement of Basis" for certain pollution discharge permits. In 1997, Montana submitted the 129 TMDLs to the EPA for approval. Each of the TMDLs was approved. The list of TMDLs submitted by Montana in 1998 consisted of the 1 nonpoint source TMDL developed in 1996 for Deep Creek, and the 129 point source TMDLs approved by the EPA in 1997.

1979 to 1992, constituted a constructive submission by the state that no WQLSs exist, thus triggering an affirmative duty upon the EPA to disapprove Montana's constructive submission and promulgate its own list of WQLSs and TMDLs.

I reject this proposition because the constructive submission theory is not applicable in this case. The constructive submission theory operates to impose a mandatory duty upon the EPA to identify WLQSs and develop TMDLs, when the EPA fails to approve any submissions of WQLSs or TMDLs before to the commencement of a citizen suit under section 505(a) of the CWA. *See, e.g., Scott v. City of Hammond, Ind., supra,* 741 F.2d 992 (finding a constructive submission when no WQLSs or TMDLs were submitted to the EPA for approval prior to citizen suit); *Alaska Ctr. for the Env't v. Reilly,* 762 F.Supp. 1422 (W.D.Wa.1991) (finding a constructive submission when only 1 WQLS was submitted to the EPA for approval prior to citizen suit, but the EPA neither approved or disapproved the submission). The constructive submission theory does not apply when the EPA approves a state's submission of WQLSs and TMDLs prior to the commencement of the citizen suit, even if the submissions are obviously inadequate. *See, e.g., Sierra Club v. Hankinson,* 939 F.Supp. 865 (N.D.Ga.1996) (constructive submission inapplicable where 123 WQLSs were submitted and approved before citizen suit and 2 TMDLs were submitted and approved after citizen suit commenced); *Idaho Sportsmen's Coalition v. Browner,* 951 F.Supp. 962 (W.D.Wa.1996) (constructive submission theory inapplicable where 3 TMDLs were submitted and approved); *Sierra Club, North Star Chapter v. Browner,* 843 F.Supp. 1304 (D.Minn.1993) (constructive submission inapplicable where 43 TMDLs submitted and approved).

Plaintiffs initiated this case on February 28, 1997. Before the suit was instituted, Montana submitted lists of WQLSs. It did so in 1992, 1994 and 1996 and promulgated a TMDL list in 1996. The 1996 submission contained 858 WQLSs and 1 TMDL. Because Montana submitted lists of WQLSs and TMDLs to the EPA before this suit began, lists that were approved by the EPA, the constructive submission theory does not impose an affirmative duty upon the EPA to identify Montana's WQLSs and TMDLs. In the absence of an affirmative duty on the EPA, plaintiffs' claim under section 505(a) of the CWA must fail.

#### b. *Inadequate State Action*

It is undisputed that Montana has not yet identified all of the WQLSs in the state, nor has it developed all of the required TMDLs. The lists of WQLSs submitted by Montana in 1992, 1994, 1996 and 1998 do not contain all of Montana's WQLSs. Furthermore, the state has not yet developed TMDLs for all of the WQLSs identified. Three thousand TMDLs need to be developed for the WQLSs identified on Montana's 1998 list. Plaintiffs argue that Montana's inadequate submission of WQLSs and TMDLs in 1992, 1994, 1996 and 1998, triggered a mandatory duty on the EPA, pursuant to section 303(d), to step in and identify Montana's WQLSs and develop the requisite TMDLs.

The section 505(a) claim fails because the submission of inadequate lists of WQLSs and TMDLs by a state does not trigger an affirmative duty on the EPA to prepare a complete list of WQLSs or TMDLs for the state. The EPA has only two affirmative duties upon receipt of a state's submission of WQLSs or TMDLs. First, the EPA has a mandatory duty to review the submission within thirty days. *See* 33 U.S.C. § 1313(d)(2). Second, if the EPA disapproves of a state's submission of WQLSs or TMDLs, the EPA has a mandatory duty to identify appropriate WQLSs and develop corresponding TMDLs within 30 days of the disapproval. *See* 33 U.S.C. § 1313(d)(2). If the EPA approves an inadequate submission WQLSs or TMDLs, a plaintiff may properly challenge the approval under section 706(2)(A) of the APA,

on the basis the approval was "arbitrary and capricious". *See, American Canoe Ass'n. v. E.P.A.,* 30 F.Supp.2d 908 (E.D.Va.1998).

### (ii) *(Count 3)—Violation of Section 706(1) of the APA*

The APA claim set forth in Count 3 is premised upon the same operative facts as the CWA claim asserted in Count 1. Plaintiffs allege the EPA's failure to identify Montana's WQLSs and develop corresponding TMDLs constitutes "agency action unlawfully withheld or unreasonably delayed" in violation of section 706(1) of the APA.

This claim is not legally viable because it is premised upon an assumption that the EPA has an affirmative duty to identify all of Montana's WQLSs and to determine corresponding TMDLs. For agency action to be unreasonably delayed or unlawfully withheld, there must be a duty imposed upon an agency to undertake a particular action. While the EPA had a mandatory duty (under the constructive submission theory) to identify Montana's WQLSs and determine Montana's TMDLs which began sometime after June 26, 1979, a duty it did not meet, that duty became moot when it approved Montana's 1992 submission of WQLSs in 1992, and later approved Montana's submission of a TMDL in 1996. There is no viable claim under section 706(1) of the APA because the EPA's approval of the initial submissions of WQLSs and TMDLs cured the EPA's original failure to act.

### (iii) *(Count 2)—Violation of Section 706(2)(A) of APA*

Plaintiffs want a declaration that the EPA's approval of Montana's 1998 submission of WQLSs and TMDLs was arbitrary and capricious, in violation of section 706(2)(A) of the APA, because the EPA approved the submission although it was deficient in the following respects.

(1) the 1998 submission failed to identify all of Montana's WQLSs;

(2) the 1998 submission failed to include certain streams as WQLSs although the plaintiffs provided sufficient evidence to compel their listing as WQLSs;

(3) the WQLSs identified in the 1998 submission were assigned priorities without proper consideration of the effect of non-point source pollution on Montana's native cold water fisheries;

(4) the 1998 submission failed to adequately respond to public comment;

(5) the 1998 submission contained 129 point source TMDLs that do not satisfy the requirements of a TMDL; and

(6) the 1998 submission contained an inadequate number of TMDLs.

■ Judicial review of agency action is governed by several recognized general principles. First, the actions of an administrative agency in executing its administrative functions are "entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The APA does not give a court the authority to substitute its judgment for that of the agency. Instead, the courts are limited to deciding whether the challenged agency action was based on a consideration of the relevant factors and whether the agency made a clear error in judgment. *Nance v. E.P.A.,* 645 F.2d 701, 705 (9th Cir.1981). A reviewing court may reverse an agency's decision only if it concludes the decision was arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with applicable law. *See* 5 U.S.C. § 706(2)(A); *People of State of Cal. v. Federal Communications Comm'n,* 905 F.2d 1217, 1230 (9th Cir.1990). A decision is "arbitrary and capricious" within the meaning of the APA if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Second, when reviewing an agency's interpretation of its own regulations, reversal is not appropriate unless the court determines the agency action lacks a "rational basis." *Kinion v. U.S.,* 8 F.3d 639, 641 (8th Cir. 1993). Third, deference to an agency's determination is especially warranted to the extent it involves the agency's scientific or other expertise. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Fourth, the burden of showing the agency's action was arbitrary and capricious lies with the plaintiff. *See Guaranty Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.,* 794 F.2d 1339, 1342 (8th Cir.1986). With these principles in mind, I consider the plaintiffs' challenges.

### (a) *Failure to Identify all of Montana's WQLSs*

Plaintiffs contend the EPA's approval of Montana's 1998 list of WQLSs was arbitrary and capricious because the 1998 list was not based upon an assessment of all the waterbodies located in the state.

■ This argument is not persuasive because neither the CWA nor the EPA regulations require a state to assess all of its waterbodies before making a submission of WQLSs. Instead, states are required to develop lists of WQLSs based on "existing and readily available water quality-related data and information." *See* 40 C.F.R. § 130.7(b)(5). Montana has not identified WQLSs for every waterbody in the state because documented water quality data does not yet exist for every waterbody.

### (b) *Failure to Identify Certain Streams as WQLSs*

■ There are 83 streams that were not included on Montana's list of WQLSs despite plaintiffs' efforts to have them identified as WQLSs. Plaintiffs maintain the EPA's approval of Montana's 1998 list, without these 83 streams, was arbitrary and capricious because plaintiffs provided data and information to Montana, during the public comment period, that was sufficient in quality and quantity to compel the listing of the 83 streams as WQLSs.

Although states are required to "assemble and evaluate" all existing and readily available data and information in developing lists of WQLSs, a state can discount or reject certain data and information as long as it provides a reasonable basis for doing so. *See* 40 C.F.R. § 130.7(b)(5); 40 C.F.R. § 130.7(b)(6)(iii). The questioned data in this case involves a Forest Service Environmental Impact Statement ("EIS") developed for Basin Creek, a report by Montana's Department of Fish, Wildlife and Parks ("FW & P") identifying streams with declining fish populations or low fish densities, and numerous stream surveys. In its 1998 list, Montana explained that although the referenced data generally appeared to be of good quality, the data did not compel the listing of additional WQLSs because the data was in a form that was not readily useable.

A number of the 83 streams that concern plaintiffs lacked sufficient geo-referencing data to enable the state to locate the effected reaches with its geographical information system. More importantly, before a stream is considered impaired, it must be shown that conditions in the stream do not satisfy Montana's native water quality standards. The EIS for Basin Creek provided data on peak flows, sediment fines, stream bed fines, stream channel stability, and fish habitat conditions. The report by the FW & P provided data on fisheries composition and density. Because Montana had no numeric water quality standards for stream bed

sediment, channel stability, peak flows, fish habitat conditions, or fisheries composition and density in 1998, it was unable to determine quantitatively whether Basin Creek and the streams identified in FW & P's report were water quality impaired.[8]

The explanation provided by Montana for not listing the 83 streams as WQLSs is not unreasonable. Accordingly, the EPA's concurrence with the state was not arbitrary and capricious.

### (c) *Failure to Consider the Effect of Nonpoint Source Pollution on Montana's Cold Water Fisheries*

Nonpoint source pollution is a problem in many states, and is generally recognized as a significant reason for the decline of native trout populations. In Montana, nonpoint source pollution stems from logging, road construction, grazing, farming and mining. Montana's 1998 list of WQLSs contains 10 trout-bearing streams that are impaired by nonpoint source pollution, but are not designated as "high priority" for TMDL development, *i.e.*, Fisher River, Corbin Creek, Godfrey Creek, Smith River, Shields River, Elk Creek, West Fork of Thompson River, West Fork of Bitterroot River, Lolo Creek and the Big Hole River. Plaintiffs claim the presence of native trout in these streams means they must be assigned a high priority designation for TMDL development. The argument goes on to state Montana's failure to make the required priority designations shows that nonpoint source pollution was not properly considered. Accordingly, plaintiffs argue the EPA's approval of the 1998 submission was arbitrary and capricious.

States are required to consider the severity of the pollution in the waterbody and the beneficial uses offered by the waterbody in assigning priority rankings to waterbodies. *See* 33 U.S.C. § 1313(d)(1)(A). The record shows that

Montana's priority ranking took these factors into account. Montana gave high priority rankings to several cold water fisheries impaired by nonpoint source pollution, *i.e.*, Tenmile Creek, Daisy Creek, Fisher Creek, the Clark Fork River, Silver Bow Creek and Swan Lake. TMDLs for the Clark Fork River and Swan Lake are nearing completion. Other cold water fisheries received a moderate priority ranking because of nonpoint source impairments, *i.e.*, Elkhorn Creek, Godfrey Creek, Otter Creek, Big Spring Creek and Whitefish Lake. Montana specifically explained in its response to public comments that the health of native fisheries, including the Bull Trout, are considered in the prioritization process. The EPA's approval of Montana's priority ranking was not arbitrary and capricious.

### (d) *Failure to Adequately Respond to Public Comments*

Both the United States Forest Service and Montana's FW & P have computer data bases pertaining to fish populations in the state. During the public comment period, plaintiffs urged the state to use these data bases in formulating its list of WQLSs. Plaintiffs contend Montana's response to its comments was inadequate, and therefore the EPA's approval of the 1998 list of WQLSs was arbitrary and capricious.

Although EPA regulations require states to "involve" the public in the process of identifying WQLSs, the regulations do not specifically require states to respond to every comment they receive from the public. *See* 40 C.F.R. § 130.7(a). In any event, the record in this case shows Montana reviewed the public comments it received and provided adequate responses to them. Those responses are set forth in "Appendix C" to the 1998 submission. The state explained that much of plaintiffs'

---

**8.** Although Montana found the data presented by plaintiffs unusable with respect to its 1998 list of WQLSs, Montana did not reject the data from consideration in the future. Montana stated that it would collect additional

data and identify appropriate reference streams, so the data presented by plaintiffs would be useable with respect to subsequent revisions of the 1998 list.

data was presented in a form that was unusable because the state had not yet developed the required reference data. Thus, there is no violation of the applicable law on this claim.

**(e)** *Submission of 129 Inadequate TMDLs*

■ The CWA and the EPA's implementing regulations require that TMDLs contain certain elements. A TMDL must identify wasteload allocations for point source pollution and load allocations for pollution from nonpoint and background sources; it must identify the maximum daily loads; it must account for seasonal variations in the waterbody; and, it must include a margin of safety. *See* 40 C.F.R. § 130.2(g), (h), (i); 40 C.F.R. 130.7(c)(1).

As discussed above, Montana's 1998 list of TMDLs contains 129 point source TMDLs that were developed by Montana between 1986 and 1996 in connection with Montana's issuance of certain point source discharge permits. Plaintiffs contend the referenced TMDLs fail to satisfy the requirements of a TMDL because (1) they were not prepared in accordance with the state's prioritization of WQLSs in 1994, (2) they did not contain total maximum daily loads, (3) they did not contain explicit loading capacities for point source, nonpoint source and background sources of pollutants, and (4) they do not account for seasonal variations. Accordingly, plaintiffs assert the EPA's approval of the TMDLs was arbitrary and capricious.

A review of the record demonstrates the 129 TMDLs at issue comply with the CWA and the EPA's implementing regulations. The TMDLs include both wasteload allocations for point sources of pollution, and load allocations for nonpoint and background sources of pollution. In situations where individual nonpoint sources load allocations could not be precisely determined, based on available data and prediction techniques, Montana estimated the load allocations in accordance with EPA regulations. *See* 40 C.F.R. § 130.2(g). The state considered seasonal variation in its TMDLs by calculating TMDLs for dif-

ferent seasons of the year, under different environmental conditions. It ensured that its TMDLs provided a margin of safety by basing the TMDLs on a semi-worst case condition of low flow, when the influence of continuous point source discharges have their greatest impact on the receiving waters. Almost all of the TMDLs developed by Montana had either an explicit or implicit "pounds per day" limitation for each pollutant. For some TMDLs, a mass per time designation was inappropriate due to the type of pollutant, such as temperature or fecal coliform bacteria. The averaging periods used in calculating its pounds per day limitations appear reasonable and appropriate under the circumstances. While it is true that the 129 TMDLs at issue were not developed in accordance with the state's prioritization of WQLSs in 1994, the submission of these TMDLs was appropriate because TMDLs developed in conjunction with the issuance of a point source discharge permit may be submitted for approval when completed, even though the corresponding waterbody is designated as a low priority for TMDL development. *See* 57 Fed.Reg. 33,040, 33,044 (July 24, 1992). The EPA's approval of the 129 TMDLs was not arbitrary and capricious.

**(f)** *Failure of DEQ to Develop a sufficient number of TMDLs for the WQLSs Identified in the 1998 Submission*

■ Montana's submission to the EPA in 1998 identified only 130 TMDLs for the approximately 900 WQLSs that were listed. It is undisputed that an additional 3000 TMDLs will need to be developed for the WQLSs identified in 1998. Plaintiffs argue that Montana's 1998 list of TMDLs is wholly inadequate, and therefore the EPA's approval of Montana's 1998 list of TMDLs was arbitrary and capricious.

The CWA declares as a national goal the elimination of pollutant discharges into navigable waters by the year 1985. *See* 33 U.S.C. § 1251(a)(1). To meet this goal, the CWA required states to promptly sub-

mit TMDLs for all WQLSs, with initial lists of TMDLs due in 1979. *See* 33 U.S.C. § 1313(d)(2). The tight deadline for submission of TMDLs emphasizes an obvious congressional mandate that TMDLs be established in a matter of years, not decades. *See Idaho Sportsmen's Coalition v. Browner*, 951 F.Supp. 962, 967 (W.D.Wa. 1996). Montana failed to develop any TMDLs until 1996. In 1996, the state only identified 1 TMDL. In the nineteen years since 1979, Montana has developed 130 TMDLs. At its current pace, the state will need over one hundred years to develop the 3000 TMDLs required for the WQLSs identified in 1998.[9] The net result will be to put off for another generation a mandate that Congress required be taken years ago. Because TMDLs provide a basis for developing pollution control measures where technology-based point source controls prove inadequate, TMDLs must be developed quickly if they are to serve their intended purpose. *See* 33 U.S.C. § 1313(d)(1)(A); *Browner, supra.*, 951 F.Supp. at 967. Montana's submission of 130 TMDLs in 1998 fails to meet the CWA's requirement that states promptly develop TMDLs for the WQLSs they identify. Accordingly, I find that the EPA acted arbitrarily and capriciously when it failed to disapprove of Montana's inadequate submission of TMDLs.

### 2. *EPA's Motion to Strike Paragraphs 12–17 and 24–44 from the Expert Report of Plaintiffs' Expert, Dr. Jack Smith*

In support of its motion for summary judgment, plaintiffs submitted a report from an expert, Dr. Jack Smith. In paragraphs 12–17 and 32–44 of the report, Dr. Smith provides his opinion that the 129 point source TMDLs approved by the EPA in 1998 do not satisfy the requirements of a TMDL prescribed in the CWA and the EPA's implementing regulations. In paragraphs 24–31 of the report, Dr. Smith provides his interpretation of various statutes and EPA regulations. The EPA urges the court to disregard the referenced paragraphs when considering the merits of plaintiff's APA claims because the information contained in these paragraphs is not part of the administrative record, and is not admissible extra-record evidence.

■ Judicial review of agency action is usually limited to a review of the administrative record. *See Friends of the Earth v. Hintz*, 800 F.2d 822, 828 (9th Cir.1986). The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). However, under certain circumstances a reviewing court may expand its review to include extra-record material. An expanded review is appropriate where:

1) It appears the agency has relied on documents or materials not included in the record;

2) The agency's failure to explain its actions frustrate judicial review;

3) Supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action; or

4) The agency has acted in bad faith.

*See Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988); *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988). Plaintiffs argue that the challenged portions of Dr. Smith's expert report are admissible extra-record evidence because (1) the challenged paragraphs aid the court in understanding the EPA's decision, (2) the EPA acted in bad faith when it approved the 129 point source TMDLs identified by Montana in 1998, and (3) the

---

**9.** I am cognizant that the state is required, under state law, to develop TMDLs, by the year 2007, for all of the approximately 900 WQLSs identified in 1996. Montana's past performance in TMDL development does not make it optimistic that the state can satisfy its own statutory mandate absent help from the EPA.

EPA's failure to adequately explain its approval of the 129 TMDLs frustrates judicial review.

██ I think the EPA's position is correct on this issue. First, the EPA's explanation for its approval is sufficient to enable appropriate and meaningful judicial review. Second, Dr. Smith's affidavit does not seems to be designed to assist me in understanding the technical terms involved in this matter, but instead it seems to attack the EPA's decision to approve the 129 TMDLs submitted by Montana. Third, plaintiffs fail to present compelling evidence that the EPA acted in bad faith in approving the TMDLs. Although Dr. Smith's expert report contains information which, if true, would not support the EPA's decision, this fact alone is not sufficient to allow supplementation of the administrative record. If that were the standard, the court would be compelled to allow supplementation of the administrative record in every case. For these reasons, I am going to disregard the questioned portions of the affidavit.

### 3. *Plaintiffs' Motions to Strike the Affidavits of Stuart Lehman and Margaret Livingston*

On May 6, 1999, the state submitted a follow-up affidavit from Stuart Lehman in support of its motion for summary judgment. Mr. Lehman is employed by the DEQ as the Section Chief of the Watershed Management Section of the Resource Protection Planning Bureau. He is responsible for coordinating Montana's development of TMDLs under the CWA. The affidavit contains information regarding TMDLs recently developed by Montana. Similarly, on May 10, 1999, the EPA filed the supplemental affidavit of Margaret J. Livingston in support of its motion for summary judgment. Ms. Livingston is an Associate Regional Counsel in the Region VIII office of the EPA in Denver, Colorado. Attached to the Livingston affidavit are a number of letters authored by the EPA describing certain TMDLs recently submitted by Montana and approved by the EPA. The Lehman and Livingston affidavits were submitted to support the argument that the "constructive submission" theory does not apply in this case. Plaintiffs urge the court to strike the affidavits because they were filed several months after the deadline for submitting summary judgment briefs and only days before the hearing on the parties' cross-motions for summary judgment.

I am going to deny the motion to strike the affidavits because Rule 56(c) provides "the adverse party prior to the day of hearing may serve opposing affidavits." Rule 56(c), F.R.Civ.P. Even so, the affidavits do not assist in determining whether the constructive submission theory is applicable in this case. For the constructive submission theory to be viable, the question is whether TMDLs were approved by the EPA prior to the filing of plaintiffs' section 303(d) claim. TMDLs approved years after a section 303(d) claim is filed are irrelevant.

### CONCLUSION

Therefore, for the reasons set forth herein,

IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for summary judgment (Doc. # 90) is DENIED with respect to Counts 1 and 2 of the complaint, and GRANTED with respect to Count 3 of the complaint to the extent described above.

2. The cross-motion for summary judgment (Doc. # 86) submitted by defendants EPA and Browner is GRANTED with respect to Counts 1 and 2 of the complaint, and DENIED with respect to Count 3 of the complaint.

3. The cross-motion for summary judgment submitted by the association intervenors (Doc. # 95)—Montana Wood Products Association, Montana Stockgrowers Association, and the Montana Farm Bureau Federation, is GRANTED with respect to Counts 1 and 2 of the complaint, and DENIED with respect to Count 3 of the complaint.

4. The cross-motion for summary judgment submitted by intervenor DEQ (Doc. # 97) is GRANTED with respect to Counts 1 and 2 of the complaint, and DENIED with respect to Count 3 of the complaint.

5. The EPA's motion to strike (Doc. # 84) paragraphs 12–17 and 24–44 from the expert report of Dr. Jack Smith is GRANTED.

6. Plaintiff's motion to strike (Doc. # 117) the supplemental affidavit of Stuart Lehman is DENIED.

7. Plaintiffs' motion to strike (Doc. # 120) the supplemental affidavit of Margaret Livingston is DENIED.

8. Within 15 days from the date of entry of this order, the parties shall submit briefs of not more than 10 pages advising the court as to the appropriate remedy for the EPA's violations of the APA. The parties shall specifically address the appointment of a special master to preside over the implementation of this order. Rule 53, F.R.Civ.P.

The clerk shall enter by separate document a judgment that conforms with this order.

The Clerk of Court is directed to notify the parties of the entry of this order.

### NUNC PRO TUNC ORDER

IT IS HEREBY ORDERED that the Order of November 4, 1999, is amended as follows:

The paragraph beginning on slip op. p. 2 and continuing on to p. 3 is amended as follows:

Several motions are before me, including the following: (1) plaintiffs' motion for summary judgment with respect to all three claims; (2) the EPA's cross-motion for summary judgment; (3) the DEQ's cross-motion for summary judgment; (4) the association intervenors' cross-motion for summary judgment; (5) the EPA's motion to strike paragraphs 12–17 and 24–44 from the expert report of Dr. Jack Smith; (6) plaintiffs' motion to strike the supplemental affidavit of Stuart Lehman; and (7) plaintiffs' motion to strike the supplemental affidavit of Margaret J. Livingston. Having considered the arguments of the parties presented in their briefs and at oral argument, **I am going to deny plaintiffs' motion for summary judgment on Counts I and III but grant them summary judgment on one part of Count II. In so doing, I am also granting the EPA and Browner's motions for summary judgment on Counts I and III but deny it on one part of Count II.** I make the same determination regarding the intervenors' dispositive motions. The other motions are dealt with below.

Paragraphs 1–4 on p. 27 are amended as follows:

1. Plaintiffs' motion for summary judgment (Doc. # 90) is **DENIED with respect to Counts 1 and 3 of the complaint, and GRANTED with respect to Count 2** of the complaint to the extent described above.

2. The cross-motion for summary judgment (Doc. # 86) submitted by defendants EPA and Browner is **GRANTED with respect to Counts 1 and 3 of the complaint, and DENIED with respect to Count 2** of the complaint.

3. The cross-motion for summary judgment submitted by the association intervenors (Doc. # 95)—Montana Wood Products Association, Montana Farm Bureau Federation, is **GRANTED with respect to Counts 1 and 3 of the complaint, and DENIED with respect to Count 2** of the complaint.

4. The cross-motion for summary judgment submitted by intervenor DEQ (Doc. # 97) is **GRANTED with respect to Counts 1 and 3** of the complaint, and **DENIED with respect to Count 2 of** the complaint.

IT IS FURTHER ORDERED that the Clerk of Court shall enter by separate

document an Amended Judgment that conforms with this order.